# NIXON *v.* UNITED STATES ET AL.

No. 91–740.   Argued October 14, 1992—Decided January 13, 1993

REHNQUIST, C. J., delivered the opinion of the Court, in which STEVENS, O'CONNOR, SCALIA, KENNEDY, and THOMAS, JJ., joined. STEVENS, J., filed a concurring opinion, *post*, p. 238. WHITE, J., filed an opinion concurring in the judgment, in which BLACKMUN, J., joined, *post*, p. 239. SOUTER, J., filed an opinion concurring in the judgment, *post*, p. 252.

*David Overlock Stewart* argued the cause for petitioner. With him on the briefs were *Peter M. Brody, Thomas B. Smith, Boyce Holleman,* and *Michael B. Holleman.*

■■■■■■

■■■■■

*Solicitor General Starr* argued the cause for respondents. With him on the brief were *Assistant Attorney General Gerson, Deputy Solicitor General Roberts,* Jeffrey P. Minear, *Douglas Letter, Michael Davidson, Ken U. Benjamin, Jr., Morgan J. Frankel,* and *Claire M. Sylvia.**

CHIEF JUSTICE REHNQUIST delivered the opinion of the Court.

Petitioner Walter L. Nixon, Jr., asks this Court to decide whether Senate Rule XI, which allows a committee of Senators to hear evidence against an individual who has been impeached and to report that evidence to the full Senate, violates the Impeachment Trial Clause, Art. I, §3, cl. 6. That Clause provides that the "Senate shall have the sole Power to try all Impeachments." But before we reach the merits of such a claim, we must decide whether it is "justiciable," that is, whether it is a claim that may be resolved by the courts. We conclude that it is not.

Nixon, a former Chief Judge of the United States District Court for the Southern District of Mississippi, was convicted by a jury of two counts of making false statements before a federal grand jury and sentenced to prison. See *United States* v. *Nixon,* 816 F. 2d 1022 (CA5 1987). The grand jury investigation stemmed from reports that Nixon had accepted a gratuity from a Mississippi businessman in exchange for asking a local district attorney to halt the prosecution of the businessman's son. Because Nixon refused to resign from his office as a United States District Judge, he continued to collect his judicial salary while serving out his prison sentence. See H. R. Rep. No. 101–36, p. 13 (1989).

On May 10, 1989, the House of Representatives adopted three articles of impeachment for high crimes and misde-

_____

*\*Patti A. Goldman* and *Alan B. Morrison* filed a brief for Public Citizen as *amicus curiae* urging reversal.

*Joseph P. Galda, Daniel J. Popeo,* and *Paul D. Kamenar* filed a brief for the Washington Legal Foundation et al. as *amici curiae* urging affirmance.

meanors. The first two articles charged Nixon with giving false testimony before the grand jury and the third article charged him with bringing disrepute on the Federal Judiciary. See 135 Cong. Rec. H1811.

After the House presented the articles to the Senate, the Senate voted to invoke its own Impeachment Rule XI, under which the presiding officer appoints a committee of Senators to "receive evidence and take testimony." Senate Impeachment Rule XI, reprinted in Senate Manual, S. Doc. No. 101–1, p. 186 (1989).[1] The Senate committee held four days of hearings, during which 10 witnesses, including Nixon, testified. S. Rep. No. 101–164, p. 4 (1989). Pursuant to Rule XI, the committee presented the full Senate with a complete transcript of the proceeding and a Report stating the uncontested facts and summarizing the evidence on the contested facts. See id., at 3–4. Nixon and the House impeachment managers submitted extensive final briefs to the full Senate

---

[1] Specifically, Rule XI provides:

"[I]n the trial of any impeachment the Presiding Officer of the Senate, if the Senate so orders, shall appoint a committee of Senators to receive evidence and take testimony at such times and places as the committee may determine, and for such purpose the committee so appointed and the chairman thereof, to be elected by the committee, shall (unless otherwise ordered by the Senate) exercise all the powers and functions conferred upon the Senate and the Presiding Officer of the Senate, respectively, under the rules of procedure and practice in the Senate when sitting on impeachment trials.

"Unless otherwise ordered by the Senate, the rules of procedure and practice in the Senate when sitting on impeachment trials shall govern the procedure and practice of the committee so appointed. The committee so appointed shall report to the Senate in writing a certified copy of the transcript of the proceedings and testimony had and given before such committee, and such report shall be received by the Senate and the evidence so received and the testimony so taken shall be considered to all intents and purposes, subject to the right of the Senate to determine competency, relevancy, and materiality, as having been received and taken before the Senate, but nothing herein shall prevent the Senate from sending for any witness and hearing his testimony in open Senate, or by order of the Senate having the entire trial in open Senate."

and delivered arguments from the Senate floor during the three hours set aside for oral argument in front of that body. Nixon himself gave a personal appeal, and several Senators posed questions directly to both parties. 135 Cong. Rec. S14493–14517 (Nov. 1, 1989). The Senate voted by more than the constitutionally required two-thirds majority to convict Nixon on the first two articles. *Id.*, at S14635 (Nov. 3, 1989). The presiding officer then entered judgment removing Nixon from his office as United States District Judge.

Nixon thereafter commenced the present suit, arguing that Senate Rule XI violates the constitutional grant of authority to the Senate to "try" all impeachments because it prohibits the whole Senate from taking part in the evidentiary hearings. See Art. I, § 3, cl. 6. Nixon sought a declaratory judgment that his impeachment conviction was void and that his judicial salary and privileges should be reinstated. The District Court held that his claim was nonjusticiable, 744 F. Supp. 9 (DC 1990), and the Court of Appeals for the District of Columbia Circuit agreed. 290 U. S. App. D. C. 420, 938 F. 2d 239 (1991). We granted certiorari. 502 U. S. 1090 (1992).

A controversy is nonjusticiable—*i. e.*, involves a political question—where there is "a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it . . . ." *Baker* v. *Carr*, 369 U. S. 186, 217 (1962). But the courts must, in the first instance, interpret the text in question and determine whether and to what extent the issue is textually committed. See *ibid.; Powell* v. *McCormack*, 395 U. S. 486, 519 (1969). As the discussion that follows makes clear, the concept of a textual commitment to a coordinate political department is not completely separate from the concept of a lack of judicially discoverable and manageable standards for resolving it; the lack of judicially manageable standards may strengthen the con-

clusion that there is a textually demonstrable commitment to a coordinate branch.

In this case, we must examine Art. I, §3, cl. 6, to determine the scope of authority conferred upon the Senate by the Framers regarding impeachment. It provides:

> "The Senate shall have the sole Power to try all Impeachments. When sitting for that Purpose, they shall be on Oath or Affirmation. When the President of the United States is tried, the Chief Justice shall preside: And no Person shall be convicted without the Concurrence of two thirds of the Members present."

The language and structure of this Clause are revealing. The first sentence is a grant of authority to the Senate, and the word "sole" indicates that this authority is reposed in the Senate and nowhere else. The next two sentences specify requirements to which the Senate proceedings shall conform: The Senate shall be on oath or affirmation, a two-thirds vote is required to convict, and when the President is tried the Chief Justice shall preside.

Petitioner argues that the word "try" in the first sentence imposes by implication an additional requirement on the Senate in that the proceedings must be in the nature of a judicial trial. From there petitioner goes on to argue that this limitation precludes the Senate from delegating to a select committee the task of hearing the testimony of witnesses, as was done pursuant to Senate Rule XI. " '[T]ry' means more than simply 'vote on' or 'review' or 'judge.' In 1787 and today, trying a case means hearing the evidence, not scanning a cold record." Brief for Petitioner 25. Petitioner concludes from this that courts may review whether or not the Senate "tried" him before convicting him.

There are several difficulties with this position which lead us ultimately to reject it. The word "try," both in 1787 and later, has considerably broader meanings than those to which petitioner would limit it. Older dictionaries define try as

"[t]o examine" or "[t]o examine as a judge." See 2 S. Johnson, A Dictionary of the English Language (1785). In more modern usage the term has various meanings. For example, try can mean "to examine or investigate judicially," "to conduct the trial of," or "to put to the test by experiment, investigation, or trial." Webster's Third New International Dictionary 2457 (1971). Petitioner submits that "try," as contained in T. Sheridan, Dictionary of the English Language (1796), means "to examine as a judge; to bring before a judicial tribunal." Based on the variety of definitions, however, we cannot say that the Framers used the word "try" as an implied limitation on the method by which the Senate might proceed in trying impeachments. "As a rule the Constitution speaks in general terms, leaving Congress to deal with subsidiary matters of detail as the public interests and changing conditions may require . . . ." *Dillon* v. *Gloss*, 256 U. S. 368, 376 (1921).

The conclusion that the use of the word "try" in the first sentence of the Impeachment Trial Clause lacks sufficient precision to afford any judicially manageable standard of review of the Senate's actions is fortified by the existence of the three very specific requirements that the Constitution does impose on the Senate when trying impeachments: The Members must be under oath, a two-thirds vote is required to convict, and the Chief Justice presides when the President is tried. These limitations are quite precise, and their nature suggests that the Framers did not intend to impose additional limitations on the form of the Senate proceedings by the use of the word "try" in the first sentence.

Petitioner devotes only two pages in his brief to negating the significance of the word "sole" in the first sentence of Clause 6. As noted above, that sentence provides that "[t]he Senate shall have the sole Power to try all Impeachments." We think that the word "sole" is of considerable significance. Indeed, the word "sole" appears only one other time in the Constitution—with respect to the House of Representatives'

"*sole* Power of Impeachment." Art. I, §2, cl. 5 (emphasis added). The commonsense meaning of the word "sole" is that the Senate alone shall have authority to determine whether an individual should be acquitted or convicted. The dictionary definition bears this out. "Sole" is defined as "having no companion," "solitary," "being the only one," and "functioning . . . independently and without assistance or interference." Webster's Third New International Dictionary 2168 (1971). If the courts may review the actions of the Senate in order to determine whether that body "tried" an impeached official, it is difficult to see how the Senate would be "functioning . . . independently and without assistance or interference."

Nixon asserts that the word "sole" has no substantive meaning. To support this contention, he argues that the word is nothing more than a mere "cosmetic edit" added by the Committee of Style after the delegates had approved the substance of the Impeachment Trial Clause. There are two difficulties with this argument. First, accepting as we must the proposition that the Committee of Style had no authority from the Convention to alter the meaning of the Clause, see 2 Records of the Federal Convention of 1787, p. 553 (M. Farrand ed. 1966) (hereinafter Farrand), we must presume that the Committee's reorganization or rephrasing accurately captured what the Framers meant in their unadorned language. See *Powell* v. *McCormack*, 395 U. S., at 538–539. That is, we must presume that the Committee did its job. This presumption is buttressed by the fact that the Constitutional Convention voted on, and accepted, the Committee of Style's linguistic version. See 2 Farrand 663–667. We agree with the Government that "the word 'sole' is entitled to no less weight than any other word of the text, because the Committee revision perfected what 'had been agreed to.'" Brief for Respondents 25. Second, carrying Nixon's argument to its logical conclusion would constrain us to say that the *second to last draft* would govern in every instance where the Com-

mittee of Style added an arguably substantive word. Such a result is at odds with the fact that the Convention passed the Committee's version, and with the well-established rule that the plain language of the enacted text is the best indicator of intent.

Petitioner also contends that the word "sole" should not bear on the question of justiciability because Art. II, § 2, cl. 1, of the Constitution grants the President pardon authority "except in Cases of Impeachment." He argues that such a limitation on the President's pardon power would not have been necessary if the Framers thought that the Senate alone had authority to deal with such questions. But the granting of a pardon is in no sense an overturning of a judgment of conviction by some other tribunal; it is "[a]n executive action that mitigates or sets aside *punishment* for a crime." Black's Law Dictionary 1113 (6th ed. 1990) (emphasis added). Authority in the Senate to determine procedures for trying an impeached official, unreviewable by the courts, is therefore not at all inconsistent with authority in the President to grant a pardon to the convicted official. The exception from the President's pardon authority of cases of impeachment was a separate determination by the Framers that executive clemency should not be available in such cases.

Petitioner finally argues that even if significance be attributed to the word "sole" in the first sentence of the Clause, the authority granted is to the Senate, and this means that "the Senate—not the courts, not a lay jury, not a Senate Committee—shall try impeachments." Brief for Petitioner 42. It would be possible to read the first sentence of the Clause this way, but it is not a natural reading. Petitioner's interpretation would bring into judicial purview not merely the sort of claim made by petitioner, but other similar claims based on the conclusion that the word "Senate" has imposed by implication limitations on procedures which the Senate might adopt. Such limitations would be inconsistent with the construction of the Clause as a whole, which, as we

have noted, sets out three express limitations in separate sentences.

The history and contemporary understanding of the impeachment provisions support our reading of the constitutional language. The parties do not offer evidence of a single word in the history of the Constitutional Convention or in contemporary commentary that even alludes to the possibility of judicial review in the context of the impeachment powers. See 290 U. S. App. D. C., at 424, 938 F. 2d, at 243; R. Berger, Impeachment: The Constitutional Problems 116 (1973). This silence is quite meaningful in light of the several explicit references to the availability of judicial review as a check on the Legislature's power with respect to bills of attainder, *ex post facto* laws, and statutes. See The Federalist No. 78, p. 524 (J. Cooke ed. 1961) ("Limitations . . . can be preserved in practice no other way than through the medium of the courts of justice").

The Framers labored over the question of where the impeachment power should lie. Significantly, in at least two considered scenarios the power was placed with the Federal Judiciary. See 1 Farrand 21–22 (Virginia Plan); *id.*, at 244 (New Jersey Plan). Indeed, James Madison and the Committee of Detail proposed that the Supreme Court should have the power to determine impeachments. See 2 *id.*, at 551 (Madison); *id.*, at 178–179, 186 (Committee of Detail). Despite these proposals, the Convention ultimately decided that the Senate would have "the sole Power to try all Impeachments." Art. I, §3, cl. 6. According to Alexander Hamilton, the Senate was the "most fit depositary of this important trust" because its Members are representatives of the people. See The Federalist No. 65, p. 440 (J. Cooke ed. 1961). The Supreme Court was not the proper body because the Framers "doubted whether the members of that tribunal would, at all times, be endowed with so eminent a portion of fortitude as would be called for in the execution of so difficult a task" or whether the Court "would possess the degree of

credit and authority" to carry out its judgment if it conflicted with the accusation brought by the Legislature—the people's representative. See *id.*, at 441. In addition, the Framers believed the Court was too small in number: "The awful discretion, which a court of impeachments must necessarily have, to doom to honor or to infamy the most confidential and the most distinguished characters of the community, forbids the commitment of the trust to a small number of persons." *Id.*, at 441–442.

There are two additional reasons why the Judiciary, and the Supreme Court in particular, were not chosen to have any role in impeachments. First, the Framers recognized that most likely there would be two sets of proceedings for individuals who commit impeachable offenses—the impeachment trial and a separate criminal trial. In fact, the Constitution explicitly provides for two separate proceedings. See Art. I, § 3, cl. 7. The Framers deliberately separated the two forums to avoid raising the specter of bias and to ensure independent judgments:

> "Would it be proper that the persons, who had disposed of his fame and his most valuable rights as a citizen in one trial, should in another trial, for the same offence, be also the disposers of his life and his fortune? Would there not be the greatest reason to apprehend, that error in the first sentence would be the parent of error in the second sentence? That the strong bias of one decision would be apt to overrule the influence of any new lights, which might be brought to vary the complexion of another decision?" The Federalist No. 65, p. 442 (J. Cooke ed. 1961).

Certainly judicial review of the Senate's "trial" would introduce the same risk of bias as would participation in the trial itself.

Second, judicial review would be inconsistent with the Framers' insistence that our system be one of checks and

balances. In our constitutional system, impeachment was designed to be the *only* check on the Judicial Branch by the Legislature. On the topic of judicial accountability, Hamilton wrote:

> "The precautions for their responsibility are comprised in the article respecting impeachments. They are liable to be impeached for mal-conduct by the house of representatives, and tried by the senate, and if convicted, may be dismissed from office and disqualified for holding any other. *This is the only provision on the point, which is consistent with the necessary independence of the judicial character, and is the only one which we find in our own constitution in respect to our own judges.*" *Id.*, No. 79, at 532–533 (emphasis added).

Judicial involvement in impeachment proceedings, even if only for purposes of judicial review, is counterintuitive because it would eviscerate the "important constitutional check" placed on the Judiciary by the Framers. See *id.*, No. 81, at 545. Nixon's argument would place final reviewing authority with respect to impeachments in the hands of the same body that the impeachment process is meant to regulate.[2]

Nevertheless, Nixon argues that judicial review is necessary in order to place a check on the Legislature. Nixon fears that if the Senate is given unreviewable authority to interpret the Impeachment Trial Clause, there is a grave risk that the Senate will usurp judicial power. The Framers anticipated this objection and created two constitutional

---

[2] Nixon contends that justiciability should not hang on the mere fact that the Judiciary's interest may be implicated or affected by the legislative action in question. In support, he cites our decisions in *Mistretta* v. *United States*, 488 U. S. 361 (1989), and *Morrison* v. *Olson*, 487 U. S. 654 (1988). These cases do not advance his argument, however, since neither addressed the issue of justiciability. More importantly, neither case involved a situation in which judicial review would remove the only check placed on the Judicial Branch by the Framers.

safeguards to keep the Senate in check. The first safeguard is that the whole of the impeachment power is divided between the two legislative bodies, with the House given the right to accuse and the Senate given the right to judge. *Id.*, No. 66, at 446. This split of authority "avoids the inconvenience of making the same persons both accusers and judges; and guards against the danger of persecution from the prevalency of a factious spirit in either of those branches." The second safeguard is the two-thirds supermajority vote requirement. Hamilton explained that "[a]s the concurrence of two-thirds of the senate will be requisite to a condemnation, the security to innocence, from this additional circumstance, will be as complete as itself can desire." *Ibid.*

In addition to the textual commitment argument, we are persuaded that the lack of finality and the difficulty of fashioning relief counsel against justiciability. See *Baker* v. *Carr*, 369 U. S., at 210. We agree with the Court of Appeals that opening the door of judicial review to the procedures used by the Senate in trying impeachments would "expose the political life of the country to months, or perhaps years, of chaos." 290 U. S. App. D. C., at 427, 938 F. 2d, at 246. This lack of finality would manifest itself most dramatically if the President were impeached. The legitimacy of any successor, and hence his effectiveness, would be impaired severely, not merely while the judicial process was running its course, but during any retrial that a differently constituted Senate might conduct if its first judgment of conviction were invalidated. Equally uncertain is the question of what relief a court may give other than simply setting aside the judgment of conviction. Could it order the reinstatement of a convicted federal judge, or order Congress to create an additional judgeship if the seat had been filled in the interim?

Petitioner finally contends that a holding of nonjusticiability cannot be reconciled with our opinion in *Powell* v. *McCormack*, 395 U. S. 486 (1969). The relevant issue in *Powell* was whether courts could review the House of Representa-

tives' conclusion that Powell was "unqualified" to sit as a Member because he had been accused of misappropriating public funds and abusing the process of the New York courts. We stated that the question of justiciability turned on whether the Constitution committed authority to the House to judge its Members' qualifications, and if so, the extent of that commitment. *Id.*, at 519, 521. Article I, §5, provides that "Each House shall be the Judge of the Elections, Returns and Qualifications of its own Members." In turn, Art. I, §2, specifies three requirements for membership in the House: The candidate must be at least 25 years of age, a citizen of the United States for no less than seven years, and an inhabitant of the State he is chosen to represent. We held that, in light of the three requirements specified in the Constitution, the word "qualifications"—of which the House was to be the Judge—was of a precise, limited nature. *Id.*, at 522; see also The Federalist No. 60, p. 409 (J. Cooke ed. 1961) ("The qualifications of the persons who may choose or be chosen, as has been remarked upon another occasion, are defined and fixed in the constitution; and are *unalterable by the legislature*") (emphasis added) (quoted in *Powell, supra,* at 539).

Our conclusion in *Powell* was based on the fixed meaning of "[q]ualifications" set forth in Art. I, §2. The claim by the House that its power to "be the Judge of the Elections, Returns and Qualifications of its own Members" was a textual commitment of unreviewable authority was defeated by the existence of this separate provision specifying the only qualifications which might be imposed for House membership. The decision as to whether a Member satisfied these qualifications *was* placed with the House, but the decision as to what these qualifications consisted of was not.

In the case before us, there is no separate provision of the Constitution that could be defeated by allowing the Senate final authority to determine the meaning of the word "try" in the Impeachment Trial Clause. We agree with Nixon that

courts possess power to review either legislative or executive action that transgresses identifiable textual limits. As we have made clear, "whether the action of [either the Legislative or Executive Branch] exceeds whatever authority has been committed, is itself a delicate exercise in constitutional interpretation, and is a responsibility of this Court as ultimate interpreter of the Constitution." *Baker* v. *Carr*, *supra*, at 211; accord, *Powell*, *supra*, at 521. But we conclude, after exercising that delicate responsibility, that the word "try" in the Impeachment Trial Clause does not provide an identifiable textual limit on the authority which is committed to the Senate.

For the foregoing reasons, the judgment of the Court of Appeals is

*Affirmed.*

JUSTICE STEVENS, concurring.

For me, the debate about the strength of the inferences to be drawn from the use of the words "sole" and "try" is far less significant than the central fact that the Framers decided to assign the impeachment power to the Legislative Branch. The disposition of the impeachment of Samuel Chase in 1805 demonstrated that the Senate is fully conscious of the profound importance of that assignment, and nothing in the subsequent history of the Senate's exercise of this extraordinary power suggests otherwise. See generally 3 A. Beveridge, The Life of John Marshall 169–222 (1919); W. Rehnquist, Grand Inquests 275–278 (1992). Respect for a coordinate branch of the Government forecloses any assumption that improbable hypotheticals like those mentioned by JUSTICE WHITE and JUSTICE SOUTER will ever occur. Accordingly, the wise policy of judicial restraint, coupled with the potential anomalies associated with a contrary view, see *ante*, at 234–236, provide a sufficient justification for my agreement with the views of THE CHIEF JUSTICE.

JUSTICE WHITE, with whom JUSTICE BLACKMUN joins, concurring in the judgment.

Petitioner contends that the method by which the Senate convicted him on two articles of impeachment violates Art. I, § 3, cl. 6, of the Constitution, which mandates that the Senate "try" impeachments. The Court is of the view that the Constitution forbids us even to consider his contention. I find no such prohibition and would therefore reach the merits of the claim. I concur in the judgment because the Senate fulfilled its constitutional obligation to "try" petitioner.

## I

It should be said at the outset that, as a practical matter, it will likely make little difference whether the Court's or my view controls this case. This is so because the Senate has very wide discretion in specifying impeachment trial procedures and because it is extremely unlikely that the Senate would abuse its discretion and insist on a procedure that could not be deemed a trial by reasonable judges. Even taking a wholly practical approach, I would prefer not to announce an unreviewable discretion in the Senate to ignore completely the constitutional direction to "try" impeachment cases. When asked at oral argument whether that direction would be satisfied if, after a House vote to impeach, the Senate, without any procedure whatsoever, unanimously found the accused guilty of being "a bad guy," counsel for the United States answered that the Government's theory "leads me to answer that question yes." Tr. of Oral Arg. 51. Especially in light of this advice from the Solicitor General, I would not issue an invitation to the Senate to find an excuse, in the name of other pressing business, to be dismissive of its critical role in the impeachment process.

Practicalities aside, however, since the meaning of a constitutional provision is at issue, my disagreement with the Court should be stated.

## II

The majority states that the question raised in this case meets two of the criteria for political questions set out in *Baker* v. *Carr*, 369 U. S. 186 (1962). It concludes first that there is "'a textually demonstrable constitutional commitment of the issue to a coordinate political department.'" It also finds that the question cannot be resolved for "'a lack of judicially discoverable and manageable standards.'" *Ante*, at 228.

Of course the issue in the political question doctrine is *not* whether the constitutional text commits exclusive responsibility for a particular governmental function to one of the political branches. There are numerous instances of this sort of textual commitment, *e. g.*, Art. I, § 8, and it is not thought that disputes implicating these provisions are nonjusticiable. Rather, the issue is whether the Constitution has given one of the political branches final responsibility for interpreting the scope and nature of such a power.

Although *Baker* directs the Court to search for "a textually demonstrable constitutional commitment" of such responsibility, there are few, if any, explicit and unequivocal instances in the Constitution of this sort of textual commitment. Conferral on Congress of the power to "Judge" qualifications of its Members by Art. I, § 5, may, for example, preclude judicial review of whether a prospective member in fact meets those qualifications. See *Powell* v. *McCormack*, 395 U. S. 486, 548 (1969). The courts therefore are usually left to infer the presence of a political question from the text and structure of the Constitution. In drawing the inference that the Constitution has committed final interpretive authority to one of the political branches, courts are sometimes aided by textual evidence that the Judiciary was not meant to exercise judicial review—a coordinate inquiry expressed in *Baker*'s "lack of judicially discoverable and manageable standards" criterion. See, *e. g.*, *Coleman* v. *Miller*, 307 U. S. 433, 452–454 (1939), where the Court refused to determine

the life span of a proposed constitutional amendment given Art. V's placement of the amendment process with Congress and the lack of any judicial standard for resolving the question. See also *id.*, at 457–460 (Black, J., concurring).

## A

The majority finds a clear textual commitment in the Constitution's use of the word "sole" in the phrase "[t]he Senate shall have the sole Power to try all Impeachments." Art. I, § 3, cl. 6. It attributes "considerable significance" to the fact that this term appears in only one other passage in the Constitution. *Ante*, at 230. See Art. I, § 2, cl. 5 (the House of Representatives "shall have the sole Power of Impeachment"). The Framers' sparing use of "sole" is thought to indicate that its employment in the Impeachment Trial Clause demonstrates a concern to give the Senate exclusive interpretive authority over the Clause.

In disagreeing with the Court, I note that the Solicitor General stated at oral argument that "[w]e don't rest our submission on sole power to try." Tr. of Oral Arg. 32; see also *id.*, at 51. The Government was well advised in this respect. The significance of the Constitution's use of the term "sole" lies not in the infrequency with which the term appears, but in the fact that it appears exactly twice, in parallel provisions concerning impeachment. That the word "sole" is found only in the House and Senate Impeachment Clauses demonstrates that its purpose is to emphasize the distinct role of each in the impeachment process. As the majority notes, the Framers, following English practice, were very much concerned to separate the prosecutorial from the adjudicative aspects of impeachment. *Ante*, at 235–236 (citing The Federalist No. 66, p. 446 (J. Cooke ed. 1961)). Giving each House "sole" power with respect to its role in impeachments effected this division of labor. While the majority is thus right to interpret the term "sole" to indicate that the Senate ought to " 'functio[n] independently

and without assistance or interference,'" *ante,* at 231, it wrongly identifies the Judiciary, rather than the House, as the source of potential interference with which the Framers were concerned when they employed the term "sole."

Even if the Impeachment Trial Clause is read without regard to its companion Clause, the Court's willingness to abandon its obligation to review the constitutionality of legislative acts merely on the strength of the word "sole" is perplexing. Consider, by comparison, the treatment of Art. I, § 1, which grants "All legislative powers" to the House and Senate. As used in that context "all" is nearly synonymous with "sole"—both connote entire and exclusive authority. Yet the Court has never thought it would unduly interfere with the operation of the Legislative Branch to entertain difficult and important questions as to the extent of the legislative power. Quite the opposite, we have stated that the proper interpretation of the Clause falls within the province of the Judiciary. Addressing the constitutionality of the legislative veto, for example, the Court found it necessary and proper to interpret Art. I, § 1, as one of the "[e]xplicit and unambiguous provisions of the Constitution [that] prescribe and define the respective functions of the Congress and of the Executive in the legislative process." *INS* v. *Chadha,* 462 U. S. 919, 945 (1983).

The majority also claims support in the history and early interpretations of the Impeachment Clauses, noting the various arguments in support of the current system made at the Constitutional Convention and expressed powerfully by Hamilton in The Federalist Nos. 65 and 66. In light of these materials there can be little doubt that the Framers came to the view at the Convention that the trial of officials' public misdeeds should be conducted by representatives of the people; that the fledgling Judiciary lacked the wherewithal to adjudicate political intrigues; that the Judiciary ought not to try both impeachments and subsequent criminal cases emanating from them; and that the impeachment power must

reside in the Legislative Branch to provide a check on the largely unaccountable Judiciary.

The majority's review of the historical record thus explains why the power to try impeachments properly resides with the Senate. It does not explain, however, the sweeping statement that the Judiciary was "not chosen to have any role in impeachments."[1] *Ante,* at 234. Not a single word in the historical materials cited by the majority addresses judicial review of the Impeachment Trial Clause. And a glance at the arguments surrounding the Impeachment Clauses negates the majority's attempt to infer nonjusticiability from the Framers' arguments in support of the Senate's power to try impeachments.

What the relevant history mainly reveals is deep ambivalence among many of the Framers over the very institution of impeachment, which, by its nature, is not easily reconciled with our system of checks and balances. As they clearly recognized, the branch of the Federal Government which is possessed of the authority to try impeachments, by having final say over the membership of each branch, holds a potentially unanswerable power over the others. In addition, that branch, insofar as it is called upon to try not only members of other branches, but also its own, will have the advantage of being the judge of its own members' causes.

It is no surprise, then, that the question of impeachment greatly vexed the Framers. The pages of the Convention debates reveal diverse plans for resolving this exceedingly difficult issue. See P. Hoffer & N. Hull, Impeachment in America, 1635–1805, pp. 97–106 (1984) (discussing various proposals). Both before and during the Convention, Madison maintained that the Judiciary ought to try impeachments. *Id.,* at 74, 98, 100. Shortly thereafter, however, he devised a quite complicated scheme that involved the partici-

---

[1] This latter contention is belied by the Impeachment Trial Clause itself, which designates the Chief Justice to preside over impeachment trials of the President.

pation of each branch. *Id.,* at 74–75. Jefferson likewise had attempted to develop an interbranch system for impeachment trials in Virginia. *Id.,* at 71–72. Even Hamilton's eloquent defense of the scheme adopted by the Constitution was based on a pragmatic decision to further the cause of ratification rather than a strong belief in the superiority of a scheme vesting the Senate with the sole power to try impeachments. While at the Convention, Hamilton advocated that impeachment trials be conducted by a court made up of state-court judges. 1 Records of the Federal Convention of 1787, pp. 292–293 (M. Farrand ed. 1966). Four months after publishing The Federalist Nos. 65 and 66, however, he urged the New York Ratifying Convention to amend the Clause he had so ably defended to have the Senate, the Supreme Court, and judges from each State jointly try impeachments. 5 The Papers of Alexander Hamilton 167–168 (H. Syrett ed. 1962).

The historical evidence reveals above all else that the Framers were deeply concerned about placing in any branch the "awful discretion, which a court of impeachments must necessarily have." The Federalist No. 65, p. 441 (J. Cooke ed. 1961). Viewed against this history, the discord between the majority's position and the basic principles of checks and balances underlying the Constitution's separation of powers is clear. In essence, the majority suggests that the Framers' conferred upon Congress a potential tool of legislative dominance yet at the same time rendered Congress' exercise of that power one of the very few areas of legislative authority immune from any judicial review. While the majority rejects petitioner's justiciability argument as espousing a view "inconsistent with the Framers' insistence that our system be one of checks and balances," *ante,* at 234, it is the Court's finding of nonjusticiability that truly upsets the Framers' careful design. In a truly balanced system, impeachments tried by the Senate would serve as a means of

controlling the largely unaccountable Judiciary, even as judicial review would ensure that the Senate adhered to a minimal set of procedural standards in conducting impeachment trials.

B

The majority also contends that the term "try" does not present a judicially manageable standard. It notes that in 1787, as today, the word "try" may refer to an inquiry in the nature of a judicial proceeding, or, more generally, to experimentation or investigation. In light of the term's multiple senses, the Court finds itself unable to conclude that the Framers used the word "try" as "an implied limitation on the method by which the Senate might proceed in trying impeachments." *Ante,* at 230. Also according to the majority, comparison to the other more specific requirements listed in the Impeachment Trial Clause—that the senators must proceed under oath and vote by two-thirds to convict, and that the Chief Justice must preside over an impeachment trial of the President—indicates that the word "try" was not meant by the Framers to constitute a limitation on the Senate's conduct and further reveals the term's unmanageability.

It is apparently on this basis that the majority distinguishes *Powell* v. *McCormack,* 395 U. S. 486 (1969). In *Powell,* the House of Representatives argued that the grant to Congress of the power to "Judge" the qualifications of its members in Art. I, § 5, precluded the Court from reviewing the House's decision that Powell was not fit for membership. We held to the contrary, noting that, although the Constitution leaves the power to "Judge" in the hands of Congress, it also enumerates, in Art. I, § 2, the "qualifications" whose presence or absence Congress must adjudge. It is precisely the business of the courts, we concluded, to determine the nature and extent of these constitutionally specified qualifications. *Id.,* at 522. The majority finds this case different from *Powell* only on the grounds that, whereas the qualifi-

246

cations of Art. I, § 2, are readily susceptible to judicial inter-
pretation, the term "try" does not provide an "identifiable
textual limit on the authority which is committed to the
Senate." *Ante,* at 238.

This argument comes in two variants. The first, which
asserts that one simply cannot ascertain the sense of "try"
which the Framers employed and hence cannot undertake
judicial review, is clearly untenable. To begin with, one
would intuitively expect that, in defining the power of a po-
litical body to conduct an inquiry into official wrongdoing,
the Framers used "try" in its legal sense. That intuition is
borne out by reflection on the alternatives. The third
Clause of Art. I, § 3, cannot seriously be read to mean that
the Senate shall "attempt" or "experiment with" impeach-
ments. It is equally implausible to say that the Senate is
charged with "investigating" impeachments given that this
description would substantially overlap with the House of
Representatives' "sole" power to draw up articles of im-
peachment. Art. I, § 2, cl. 5. That these alternatives are
not realistic possibilities is finally evidenced by the use of
"tried" in the third sentence of the Impeachment Trial
Clause ("[w]hen the President of the United States is
tried . . ."), and by Art. III, § 2, cl. 3 ("[t]he Trial of all
Crimes, except in Cases of Impeachment . . .").

The other variant of the majority position focuses not on
which sense of "try" is employed in the Impeachment Trial
Clause, but on whether the legal sense of that term creates
a judicially manageable standard. The majority concludes
that the term provides no "identifiable textual limit." Yet,
as the Government itself conceded at oral argument, the
term "try" is hardly so elusive as the majority would have
it. See Tr. of Oral Arg. 51–52. Were the Senate, for exam-
ple, to adopt the practice of automatically entering a judg-
ment of conviction whenever articles of impeachment were
delivered from the House, it is quite clear that the Senate

will have failed to "try" impeachments.[2]   See *id.*, at 52.   Indeed in this respect, "try" presents no greater, and perhaps fewer, interpretive difficulties than some other constitutional standards that have been found amenable to familiar techniques of judicial construction, including, for example, "Commerce . . . among the several States," Art. I, § 8, cl. 3, and "due process of law," Amdt. 5.   See *Gibbons* v. *Ogden*, 9 Wheat. 1, 189 (1824) ("The subject to be regulated is commerce; and our constitution being . . . one of enumeration, and not of definition, to ascertain the extent of the power, it becomes necessary to settle the meaning of the word"); *Mathews* v. *Eldridge*, 424 U. S. 319, 334 (1976) ("'"[D]ue process," unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances'") (quoting *Cafeteria & Restaurant Workers* v. *McElroy*, 367 U. S. 886, 895 (1961)).[3]

---

[2] It is not a sufficient rejoinder to this example to say, with one of the Court of Appeals judges below, that it postulates a "monstrous hypothetical abuse."   See 290 U. S. App. D. C. 420, 427, 938 F. 2d 239, 246 (1991). The unlikelihood of the example being realized does not undermine the point that "try" has a definable meaning and thus ought to be regarded as judicially manageable.

[3] The majority's *in terrorem* argument against justiciability—that judicial review of impeachments might cause national disruption and that the courts would be unable to fashion effective relief—merits only brief attention.   In the typical instance, court review of impeachments would no more render the political system dysfunctional than has this litigation. Moreover, the same capacity for disruption was noted and rejected as a basis for not hearing *Powell*.   *Powell* v. *McCormack*, 395 U. S. 486, 549 (1969).   The relief granted for unconstitutional impeachment trials would presumably be similar to the relief granted to other unfairly tried public employee-litigants.   Finally, as applied to the special case of the President, the majority's argument merely points out that, were the Senate to convict the President without any kind of a trial, a constitutional crisis might well result.   It hardly follows that the Court ought to refrain from upholding the Constitution in all impeachment cases.   Nor does it follow that, in cases of Presidential impeachment, the Justices ought to abandon their constitutional responsibilities because the Senate has precipitated a crisis.

### III

The majority's conclusion that "try" is incapable of meaningful judicial construction is not without irony.   One might think that if any class of concepts would fall within the definitional abilities of the Judiciary, it would be that class having to do with procedural justice.   Examination of the remaining question—whether proceedings in accordance with Senate Rule XI are compatible with the Impeachment Trial Clause—confirms this intuition.

Petitioner bears the rather substantial burden of demonstrating that, simply by employing the word "try," the Constitution prohibits the Senate from relying on a factfinding committee.   It is clear that the Framers were familiar with English impeachment practice and with that of the States employing a variant of the English model at the time of the Constitutional Convention.   Hence there is little doubt that the term "try" as used in Art. I, § 3, cl. 6, meant that the Senate should conduct its proceedings in a manner somewhat resembling a judicial proceeding.   Indeed, it is safe to assume that Senate trials were to follow the practice in England and the States, which contemplated a formal hearing on the charges, at which the accused would be represented by counsel, evidence would be presented, and the accused would have the opportunity to be heard.

Petitioner argues, however, that because committees were not used in state impeachment trials prior to the Convention, the word "try" cannot be interpreted to permit their use.   It is, however, a substantial leap to infer from the absence of a particular device of parliamentary procedure that its use has been forever barred by the Constitution.   And there is textual and historical evidence that undermines the inference sought to be drawn in this case.

The fact that Art. III, § 2, cl. 3, specifically exempts impeachment trials from the jury requirement provides some evidence that the Framers were anxious not to have additional specific procedural requirements read into the term

"try." Contemporaneous commentary further supports this view. Hamilton, for example, stressed that a trial by so large a body as the Senate (which at the time promised to boast 26 members) necessitated that the proceedings not "be tied down to . . . strict rules, either in the delineation of the offence by the prosecutors, or in the construction of it by the Judges . . . ." The Federalist No. 65, p. 441 (J. Cooke ed. 1961). In his extensive analysis of the Impeachment Trial Clause, Justice Story offered a nearly identical analysis, which is worth quoting at length.

> "[I]t is obvious, that the strictness of the forms of pro-ceeding in cases of offences at common law is ill adapted to impeachments. The very habits growing out of judi-cial employments; the rigid manner, in which the discre-tion of judges is limited, and fenced in on all sides, in order to protect persons accused of crimes by rules and precedents; and the adherence to technical principles, which, perhaps, distinguishes this branch of the law, more than any other, are all ill adapted to the trial of political offences, in the broad course of impeachments. And it has been observed with great propriety, that a tribunal of a liberal and comprehensive character, con-fined, as little as possible, to strict forms, enabled to con-tinue its session as long as the nature of the law may require, qualified to view the charge in all its bearings and dependencies, and to appropriate on sound princi-ples of public policy the defence of the accused, seems indispensable to the value of the trial. The history of impeachments, both in England and America, justifies the remark. There is little technical in the mode of pro-ceeding; the charges are sufficiently clear, and yet in a general form; there are few exceptions, which arise in the application of the evidence, which grow out of mere technical rules and quibbles. And it has repeatedly been seen, that the functions have been better under-stood, and more liberally and justly expounded by states-

men, then by mere lawyers." 1 J. Story, Commentaries on the Constitution of the United States § 765, p. 532 (3d ed. 1858).

It is also noteworthy that the delegation of factfinding by judicial and quasi-judicial bodies was hardly unknown to the Framers. Jefferson, at least, was aware that the House of Lords sometimes delegated factfinding in impeachment trials to committees and recommended use of the same to the Senate. T. Jefferson, A Manual of Parliamentary Practice for the Use of the Senate of the United States § LIII (2d ed. 1812) ("The practice is to swear the witnesses in open House, and then examine them there: or a committee may be named, who shall examine them in committee . . ."), reprinted in Jefferson's Parliamentary Writings, The Papers of Thomas Jefferson, Second Series 424 (W. Howell ed. 1988). The States also had on occasion employed legislative committees to investigate whether to draw up articles of impeachment. See Hoffer & Hull, Impeachment in America, at 29, 33. More generally, in colonial governments and state legislatures, contemnors appeared before committees to answer the charges against them. See *Groppi* v. *Leslie*, 404 U. S. 496, 501 (1972). Federal courts likewise had appointed special masters and other factfinders "[f]rom the commencement of our Government." *Ex parte Peterson*, 253 U. S. 300, 312 (1920). Particularly in light of the Constitution's grant to each House of the power to "determine the Rules of its Proceedings," see Art. I, § 5, cl. 2, the existence of legislative and judicial delegation strongly suggests that the Impeachment Trial Clause was not designed to prevent employment of a factfinding committee.

In short, textual and historical evidence reveals that the Impeachment Trial Clause was not meant to bind the hands of the Senate beyond establishing a set of minimal procedures. Without identifying the exact contours of these procedures, it is sufficient to say that the Senate's use of a factfinding committee under Rule XI is entirely compatible with

the Constitution's command that the Senate "try all impeachments." Petitioner's challenge to his conviction must therefore fail.

## IV

Petitioner has not asked the Court to conduct his impeachment trial; he has asked instead that it determine whether his impeachment was tried by the Senate. The majority refuses to reach this determination out of a laudable desire to respect the authority of the Legislature. Regrettably, this concern is manifested in a manner that does needless violence to the Constitution.[4] The deference that is owed can

---

[4] Although our views might well produce identical results in most cases, the same objection may be raised against the prudential version of political question doctrine presented by JUSTICE SOUTER. According to the prudential view, judicial determination of whether the Senate has conducted an impeachment trial would interfere unacceptably with the Senate's work and should be avoided except where necessitated by the threat of grave harm to the constitutional order. As articulated, this position is missing its premise: No explanation is offered as to why it would show disrespect or cause disruption or embarrassment to review the action of the Senate in this case as opposed to, say, the enactment of legislation under the Commerce Clause. The Constitution requires the courts to determine the validity of statutes passed by Congress when they are challenged, even though such laws are passed with the firm belief that they are constitutional. The exercise of judicial review of this kind, with all of its attendant risk of interference and disrespect, is not conditioned upon a showing in each case that without it the Republic would be at risk. Some account is therefore needed as to why prudence does not counsel against judicial review in the typical case, yet does so in this case.

In any event, the prudential view cannot achieve its stated purpose. The judgment it wishes to avoid—and the attendant disrespect and embarrassment—will inevitably be cast because the courts still will be required to distinguish cases on their merits. JUSTICE SOUTER states that the Court ought not to entertain petitioner's constitutional claim because "[i]t seems fair to conclude," *post*, at 253, that the Senate tried him. In other words, on the basis of a preliminary determination that the Senate has acted within the "broad boundaries" of the Impeachment Trial Clause, it is concluded that we must refrain from making that determination. At best, this approach offers only the illusion of deference and respect by substituting impressionistic assessment for constitutional analysis.

be found in the Constitution itself, which provides the Senate ample discretion to determine how best to try impeachments.

JUSTICE SOUTER, concurring in the judgment.

I agree with the Court that this case presents a nonjusticiable political question. Because my analysis differs somewhat from the Court's, however, I concur in its judgment by this separate opinion.

As we cautioned in *Baker* v. *Carr,* 369 U. S. 186, 210–211 (1962), "the 'political question' label" tends "to obscure the need for case-by-case inquiry." The need for such close examination is nevertheless clear from our precedents, which demonstrate that the functional nature of the political question doctrine requires analysis of "the precise facts and posture of the particular case," and precludes "resolution by any semantic cataloguing," *id.,* at 217:

> "Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question." *Ibid.*

Whatever considerations feature most prominently in a particular case, the political question doctrine is "essentially a function of the separation of powers," *ibid.,* existing to restrain courts "from inappropriate interference in the business of the other branches of Government," *United States* v.

*Munoz-Flores*, 495 U. S. 385, 394 (1990), and deriving in large part from prudential concerns about the respect we owe the political departments, see *Goldwater* v. *Carter*, 444 U. S. 996, 1000 (1979) (Powell, J., concurring in judgment); A. Bickel, The Least Dangerous Branch 125–126 (2d ed. 1986); Finkelstein, Judicial Self-Limitation, 37 Harv. L. Rev. 338, 344–345 (1924). Not all interference is inappropriate or disrespectful, however, and application of the doctrine ultimately turns, as Learned Hand put it, on "how importunately the occasion demands an answer." L. Hand, The Bill of Rights 15 (1958).

This occasion does not demand an answer. The Impeachment Trial Clause commits to the Senate "the sole Power to try all Impeachments," subject to three procedural requirements: the Senate shall be on oath or affirmation; the Chief Justice shall preside when the President is tried; and conviction shall be upon the concurrence of two-thirds of the Members present. U. S. Const., Art. I, § 3, cl. 6. It seems fair to conclude that the Clause contemplates that the Senate may determine, within broad boundaries, such subsidiary issues as the procedures for receipt and consideration of evidence necessary to satisfy its duty to "try" impeachments. Other significant considerations confirm a conclusion that this case presents a nonjusticiable political question: the "unusual need for unquestioning adherence to a political decision already made," as well as "the potentiality of embarrassment from multifarious pronouncements by various departments on one question." *Baker, supra*, at 217. As the Court observes, see *ante*, at 236, judicial review of an impeachment trial would under the best of circumstances entail significant disruption of government.

One can, nevertheless, envision different and unusual circumstances that might justify a more searching review of impeachment proceedings. If the Senate were to act in a manner seriously threatening the integrity of its results, convicting, say, upon a coin toss, or upon a summary determination that an officer of the United States was simply " 'a bad

guy,'" *ante*, at 239 (WHITE, J., concurring in judgment), judicial interference might well be appropriate.   In such circumstances, the Senate's action might be so far beyond the scope of its constitutional authority, and the consequent impact on the Republic so great, as to merit a judicial response despite the prudential concerns that would ordinarily counsel silence.   "The political question doctrine, a tool for maintenance of governmental order, will not be so applied as to promote only disorder."   *Baker, supra*, at 215.