TYMKOVICH, Circuit Judge,
joined by HOLMES, Circuit Judge, dissenting from denial of Rehearing Petition, En Banc.
I would hear this ease en banc. The panel’s decision mistakenly extends the doctrine of legislative standing, as articulated in Raines v. Byrd, 521 U.S. 811, 117 S.Ct. 2312, 138 L.Ed.2d 849 (1997), and contradicts Supreme Court precedent as to the non-justiciability of the Guarantee Clause, U.S. Const, art. IV, § 4. Because the issues presented in this case are of exceptional importance to the separation of powers that undergirds our constitutional structure, I would grant Governor Hicken-looper’s petition.
Colorado’s Taxpayers Bill of Rights (TABOR), Colo. Const, art. X, § 20, is a state constitutional provision that requires a vote of the people before new taxes can be imposed or tax rates can be increased. The legislator-plaintiffs argue that they are injured by this constitutional provision because TABOR dilutes their core legislative prerogative to increase taxes and that this injury confers Article III standing.
But many state constitutional provisions cause the same type of injury. The net result of the panel’s decision ratifying standing is that just about any policy provision codified in the state constitution *1189 would be subject to legislative standing and attack on the theory of vote dilution.
Thus, consider the effect of this view of legislative standing:
• According to the panel’s logic, state legislators would have standing to challenge the state constitution’s protection of the recreational use of marijuana, Colo. Const., art. XVIII, § 16, on the theory that the provision infringes on the legislative core function of codifying the criminal law.
• Legislators would also have standing to challenge the mandatory school funding provision of the state constitution, Colo. Const., art. IX, § 17, because it deprives them of their right to cast effective votes on appropriations and education policy.
• Legislators are required to divvy up funds from casino gambling to specific recreational and environmental uses under the Great Outdoors Colorado Amendment, Colo. Const., art. XXVII, § 1. They could argue this requirement injures their ability to spend the money on other pressing social issues.
• And on and on and on throughout the Colorado Constitution (and the constitutions of other Tenth Circuit states).
The panel’s view of legislative standing reaches well beyond Supreme Court precedent. And by remanding for further proceedings under the Guarantee Clause, the decision squarely conflicts with longstanding Supreme Court precedent that holds such inquiries are beyond the scope of federal-court review.

Legislative Standing

Article III standing requires the plaintiff to have a suffered an “injury in fact,” a causal connection between the injury and the challenged conduct, and that the injury be redressable by a favorable decision. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). Consistent with Article Ill’s strict standing requirements, it is rare for legislators to have standing to challenge a law or action that results in a loss of the legislature’s political power. That is because institutional injuries of this Mnd are shared by all members of the legislature, so plaintiffs suing in their legislative capacities usually cannot establish a “concrete and particularized” injury for standing purposes. Id. at 560, 112 S.Ct. 2130.
In this light, the Supreme Court has held that the “abstract dilution of institutional legislative power” is not a judicially cognizable injury for purposes of individual legislators’ standing. Raines, 521 U.S. at 826, 117 S.Ct. 2312. Raines reserves a narrow exception to the rule against legislative standing — those actions that result in “vote nullification.” Id. (citing Coleman v. Miller, 307 U.S. 433, 438, 59 S.Ct. 972, 83 L.Ed. 1385 (1939) (holding that legislator-plaintiffs’ votes were nullified if their votes against ratification of a constitutional amendment were “overridden”)).
The legislator-plaintiffs in this case have alleged that TABOR violates the United States Constitution’s Guarantee Clause, which provides that “[t]he United States shall guarantee to every State in this Union a Republican Form of Government. ...” U.S. Const, art. IV, § 4. They argue that the Guarantee Clause requires state constitutions to preserve state legislators’ ability to perform “legislative core functions,” which the plaintiffs contend include taxation and appropriation. Kerr v. Hickenlooper, 744 F.3d 1156, 1165 (10th Cir.2014). TABOR, because it requires successful legislative votes in favor of tax increases or new taxes to be approved by citizen referendum before being implemented, has allegedly resulted in injury to them as lawmakers. In this way, TABOR reduces the legislators’ authority to cast fully effective votes in favor of tax increases.
*1190 In Raines, the Supreme Court held that plaintiffs, members of Congress, did not have standing to challenge the Line Item Veto Act, rejecting an argument that the Act denied them the “meaning” and “effectiveness” of their votes on appropriations bills. 521 U.S. at 825-26, 117 S.Ct. 2312. The plaintiffs alleged the Act deprived them of their “plain, direct and adequate interest in maintaining the effectiveness of their votes.” Id. at 821-22, 117 S.Ct. 2312 (relying on Coleman, 307 U.S. at 438, 59 S.Ct. 972). Rejecting a broad approach, the Court held that legislative standing exists only where plaintiffs’ votes have been “completely nullified” or “deprived of all validity.” Id. at 822-23, 59 S.Ct. 972. The Court concluded that the line item veto caused abstract dilution of Congress’s power, rather than vote nullification, and thus the plaintiffs’ alleged injury was not judicially cognizable. Id. at 826, 59 S.Ct. 972.
The panel sees a distinction between this case and Raines — the lack of legislative remedies available to the plaintiffs under TABOR. The lack of legislative remedies is, of course, relevant to determining whether the plaintiffs have suffered complete nullification of their votes. But all of the cases cited by the panel stand for the proposition that legislator-plaintiffs do not suffer complete nullification of their votes where legislative remedies remain available. See, e.g., Schaffer v. Clinton, 240 F.3d 878, 885-86 (10th Cir.2001). The inverse is not necessarily true — the lack of legislative remedies is necessary, but not sufficient, to show vote nullification. The dispositive question is whether the injury caused by TABOR constitutes vote nullification as understood in Raines. It does not.
The plaintiffs’ theory of the case is that their votes are ineffective in light of the requirements of the Guarantee Clause because the “end result of a successful legislative vote in favor of a tax increase is not a change in the law.” Kerr, 744 F.3d at 1165. Put another way, the right to an “effective” vote for standing purposes is the right to have a successful vote given its full effect under the relevant constitutional provision, not just some legal effect.
But, in Raines, the Court rejected a similar argument. According to the Raines plaintiffs, the legislation rendered their future votes ineffective in light of the requirements of the Presentment Clause because all approved appropriations were no longer inextricably linked for the President’s signature or veto. See Raines, 521 U.S. at 825, 117 S.Ct. 2312. The Court described this change in effectiveness as “abstract dilution of institutional legislative power” rather than “vote nullification.” Id. at 826, 117 S.Ct. 2312. The Court further noted that “[i]n the future, a majority of Senators and Congressmen can pass or reject appropriations bills; the Act has no effect on this process.” Id. at 824, 117 S.Ct. 2312. The Court thus rejected the idea that the failure to give a successful vote its full effect under the Presentment Clause was a judicially cognizable injury to the plaintiffs as lawmakers — the claim was, rather, “based on a loss of political power.” Id. at 821, 117 S.Ct. 2312.
The panel’s view of Raines makes any state constitutional provision that limits a legislature’s authority over a policy area vulnerable to legislative standing on a Guarantee Clause claim. But TABOR and the other constitutional provisions described above do not completely nullify the plaintiffs’ votes nor deprive their votes of all validity. As to TABOR, a new tax or tax increase that passes the General Assembly and is signed by the governor is referred to the statewide ballot for a voter referendum and may indeed become law. A successful vote still has substantial legal *1191 effect. Although the legal effect of a successful vote is less than it might have been without TABOR, Raines makes clear that abstract institutional injuries of this kind cannot confer legislative standing.
Further, even if it were plausible that votes for tax increases were not given legal effect, the resulting injury falls far short of the type of institutional injury at issue in Coleman. In Raines, the Supreme Court noted that Coleman allows for legislative standing when there has been “complete nullification” of a vote for a “specific legislative Act.” Id. at 823, 117 S.Ct. 2312. In this case, the legislator-plaintiffs have not voted in favor of a successful tax measure that was subsequently denied in a referendum. The panel attempts to explain away the “specific legislative Act” requirement by asserting it would be absurd if legislators could bring a claim for nullification of a specific vote but not for “nullification of a legislator’s authority to cast a large number of votes.” Kerr, 744 F.3d at 1170. But Raines stands for that precise proposition: legislative standing is limited to claims of nullifications of specific, otherwise valid votes. The withdrawal of authority to cast a large number of votes with a particular degree of effectiveness is another way of alleging that the legislature has suffered an abstract institutional injury. Without the complete nullification of an actual vote, there is no concrete injury under Raines.
Even if the legislator-plaintiffs are correct on the merits of their argument — that TABOR’s reduction of legislative authority violates the Guarantee Clause — the federal courts can only hear claims made by plaintiffs who have suffered a judicially cognizable injury. An abstract reduction of authority to raise taxes is an institutional injury based on the dilution of political power. This cannot serve as a basis for legislative standing.

Political Question Doctrine

I also see no basis for the panel’s conclusion that the Supreme Court has retreated from considering Guarantee Clause challenges to be non-justiciable under the political question doctrine. And, in particular, as I explain further below, the Court has held that Guarantee Clause challenges to statewide direct democracy provisions, like TABOR, are non-justiciable.
Federal courts lack authority to hear cases that involve a “political question.” The Supreme Court has held that a case “involves a political question ... where there is a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it.” Zivotofsky ex rel. Zivotofsky v. Clinton, — U.S. -, 132 S.Ct. 1421, 1427, 182 L.Ed.2d 423 (2012) (quoting Nixon v. United States, 506 U.S. 224, 228, 113 S.Ct. 732, 122 L.Ed.2d 1 (1993)).
The Supreme Court has long maintained that Guarantee Clause claims are generally non-justiciable under the political question doctrine. See, e.g., City of Rome v. United States, 446 U.S. 156, 183, 100 S.Ct. 1548, 64 L.Ed.2d 119 (1980) (“We do not reach the merits of the appellants’ argument that the Act violates the Guarantee Clause, Art. IV, § 4, since that issue is not justiciable.”), abrogated on other grounds by Shelby Cnty. v. Holder, — U.S.-, 133 S.Ct. 2612, 186 L.Ed.2d 651 (2013); Baker v. Carr, 369 U.S. 186, 218, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962).
The panel’s conclusion that Guarantee Clause claims are not generally barred by the political question doctrine derives from an erroneous reading of Baker v. Carr. Baker involved an equal-protection challenge to Tennessee’s apportionment statute. Tennessee argued that apportionment cases, regardless of how the litigants *1192 characterized the case, can implicate no constitutional provision except the Guarantee Clause and that such claims present non-justiciable political questions. Baker, 369 U.S. at 209, 82 S.Ct. 691. In explaining that equal protection challenges to apportionment statutes were justiciable, the Supreme Court clarified that previous Guarantee Clause claims were considered non-justiciable not because they “touch[ed] upon matters of state governmental organization,” but because such claims involve at least one of the six factors that make up the political question doctrine. Id. at 218, 82 S.Ct. 691. The panel reads this clarification as a rejection of the general rule that Guarantee Clause claims are non-jus-ticiable. But nowhere in Baker does the Supreme Court retreat from previous cases holding that Guarantee Clause claims are non-justiciable — the Court simply explained why Guarantee Clause claims have always been found non-justiciable. Indeed, the Court’s explanation of the non-justiciability of Guarantee Clause claims strongly suggests the Court held that such claims always involve political questions. Id. (“We shall discover that Guaranty Clause claims involve those elements which define a ‘political question,’ and for that reason and no other, they are nonjusticiable.”).
In addition to recognizing this general rule, the Supreme Court has already held that challenges to state-level direct democracy provisions under the Guarantee Clause are non-justiciable. In Pacific States Telephone & Telegraph Co. v. Oregon, 223 U.S. 118, 32 S.Ct. 224, 56 L.Ed. 377 (1912), the Supreme Court held that a Guarantee Clause challenge to a tax increase enacted through Oregon’s initiative and referendum process was non-justicia-ble because the Constitution confers only on Congress the power to determine whether a state government is republican in form. Id. at 150-51, 32 S.Ct. 224 (holding it is “the [federal] legislative duty to determine the political questions involved in deciding whether a state government republican in form exists”).
The panel distinguishes Pacific States by arguing the lawsuit in that case was a “wholesale attack[] on the validity of a state’s government rather than ... a challenge to a single provision of a state constitution.” Kerr, 744 F.3d at 1173 (citing Pacific States, 223 U.S. at 150, 32 S.Ct. 224 (“[T]he assault which the contention here advanced makes is not on the tax as a tax, but on the state as a state.”)). The panel maintains that, in contrast to Pacific States, the issue in this case is only whether “one provision of the Colorado Constitution brings it below a constitutionally mandated threshold.” Id. at 1173 n. 11.
I do not think this is a meaningful distinction. The Guarantee Clause presents a dichotomy: either a state government is republican in form (and thus a “valid” government) or it is not. The plaintiffs in this case have alleged that TABOR is inconsistent with the Guarantee Clause. In other words, TABOR renders the Colorado government non-republican in form.
' In Pacific States, the Supreme Court explained the petitioners’ claim called into question the validity of not only the particular tax statute adopted by referendum, but “every other statute passed in Oregon since the adoption of the initiative and referendum” because they were passed by a government not republican in form. 223 U.S. at 141, 32 S.Ct. 224. This description may have been somewhat hyperbolic, considering the wide discretion courts have to fashion the appropriate remedy, but its logic is equally applicable to the claim in this case. Ultimately, the essence of the claims in Pacific States and in the case before us — that a state constitution’s direct democracy provision renders the state government non-republican in form — is the same. The Court squarely held that this *1193 question is textually committed to Congress. Id. at 150-51, 32 S.Ct. 224.
Moreover, the panel’s opinion does not expressly find that there are “judicially discoverable and manageable standards” for resolving the case; it simply assures the reader that judicially manageable standards might emerge at a future stage of litigation. The panel gives no support for its conclusion besides a comparison to District of Columbia v. Heller, 554 U.S. 570, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008), where the Supreme Court was able to determine the meaning and scope of the Second Amendment based on a detailed historical inquiry. The panel is confident that the parties will be able to produce materials that will allow for a similar inquiry into the meaning of the Guarantee Clause.
But the requirement that there be “judicially discoverable and manageable standards” is driven by more than concerns about the difficulty of a historical inquiry. Instead, this Baker factor requires a court to determine whether it can decide a legal issue in a way that is “principled, rational, and based upon reasoned distinctions.” Vieth v. Jubelirer, 541 U.S. 267, 278, 124 S.Ct. 1769, 158 L.Ed.2d 546 (2004) (plurality opinion). The majority gives us nothing besides a mere assurance that the Guarantee Clause contains standards allowing for a principled and rational application that remain to be found. But the panel’s failure to at least hint at what the relevant standards are for Guarantee Clause litigation deprives the litigants and district court of necessary guidance as to how these claims are to be adjudicated.
The sharp dichotomy in the Guarantee Clause between republican and non-republican forms of government is all the more reason for concern in this case. The judicial line-drawing that will be required to determine whether a direct democracy provision renders a state government non-republican in form leads me to doubt that a court can decide this case in a way that is “principled, rational, and based upon reasoned distinctions.”
Because the panel’s opinion is inconsistent with Supreme Court precedent on legislative standing and the non-justiciability of the Guarantee Clause, I would have granted the Governor’s petition for rehearing en banc.