IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Carmon Elliott,                           :
              Petitioner                  :
                                          :
          v.                              :
                                          :
Ted Cruz,                                 :
              Respondent                  :     No. 77 M.D. 2016


**O R D E R**


AND NOW, this 28<u>th</u>  day of <u>April</u>, 2016, the opinion filed March 10, 2016, in the above-captioned matter shall be designated Opinion rather than Memorandum Opinion, and it shall be reported.


_____
DAN PELLEGRINI, Senior Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Carmon Elliott,                         :
                Petitioner         :
                                  :
        v.                        :    No. 77 M.D. 2016
                                  :    Heard:  March 10, 2016
Ted Cruz,                               :
                Respondent         :


BEFORE:    HONORABLE DAN PELLEGRINI, Senior Judge


OPINION BY
SENIOR JUDGE PELLEGRINI                         FILED: March 10, 2016


Before this Court is a petition to set aside the nomination petition of Ted Cruz (Candidate), pursuant to which he seeks to appear on the April 26, 2016 primary election ballot for the Office of the President of the United States of America, filed by Carmon Elliott (Objector), a registered Republican who resides and votes in Pennsylvania, asserting that the Candidate is ineligible to hold that office under the United States Constitution.

The parties have stipulated that the Candidate was born on December 22, 1970, in Calgary, Alberta, Canada; that his mother, Eleanor Darragh, was born on November 23, 1934, in the State of Delaware; that his mother is and has always has been a United States citizen, since the moment of her birth; that at the time of the Candidate's birth, his mother had been physically present in the United States

for more than ten years of her life, including at least five years after she reached the age of fourteen;  and that the Candidate was a citizen from the moment of his birth.

Because the Candidate was born in Canada, Petitioner contends that Candidate's name should be stricken from the Pennsylvania 2016 primary ballot because he is not a "natural born citizen" within the meaning of Article II, Section 1,[1] clause 5 of the United States Constitution.

---

[1] The entire text of Article II, Section 1 provides:

> The executive Power shall be vested in a President of the United States of America.  He shall hold his Office during the Term of four Years, and, together with the Vice President, chosen for the same Term, be elected, as follows:

> Each State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors, equal to the whole Number of Senators and Representatives to which the State may be entitled in the Congress: but no Senator or Representative, or Person holding an Office of Trust or Profit under the United States, shall be appointed an Elector.

> The Congress may determine the Time of chusing the Electors, and the Day on which they shall give their Votes; which Day shall be the same throughout the United States.

> No Person except a natural born Citizen, or a Citizen of the United States, at the time of the Adoption of this Constitution, shall be eligible to the Office of President; neither shall any Person be eligible to that Office who shall not have attained to the Age of thirty five Years, and been fourteen Years a Resident within the United States.

> In Case of the Removal of the President from Office, or of his Death, Resignation, or Inability to discharge the Powers and Duties of the said Office, the Same shall devolve on the Vice

2

President, and the Congress may by Law provide for the Case of Removal, Death, Resignation or Inability, both of the President and Vice President, declaring what Officer shall then act as President, and such Officer shall act accordingly, until the Disability be removed, or a President shall be elected.

The President shall, at stated Times, receive for his Services, a Compensation, which shall neither be encreased nor diminished during the Period for which he shall have been elected, and he shall not receive within that Period any other Emolument from the United States, or any of them.

Before he enter on the Execution of his Office, he shall take the following Oath or Affirmation:--"I do solemnly swear (or affirm) that I will faithfully execute the Office of President of the United States, and will to the best of my Ability, preserve, protect and defend the Constitution of the United States."

U.S. CONST. art. II, § 1.

The Twelfth Amendment further provides:

The Electors shall meet in their respective states and vote by ballot for President and Vice-President, one of whom, at least, shall not be an inhabitant of the same state with themselves; they shall name in their ballots the person voted for as President, and in distinct ballots the person voted for as Vice-President, and they shall make distinct lists of all persons voted for as President, and of all persons voted for as Vice-President, and of the number of votes for each, which lists they shall sign and certify, and transmit sealed to the seat of the government of the United States, directed to the President of the Senate;--The President of the Senate shall, in the presence of the Senate and House of Representatives, open all the certificates and the votes shall then be counted;--The person having the greatest number of votes for President, shall be the President, if such number be a majority of the whole number of Electors appointed; and if no person have such majority, then from the persons having the highest numbers not exceeding three on the list of those voted for as President, the House of Representatives shall choose immediately, by ballot, the President. But in choosing

3

**I.**

**A.**

Initially, the Candidate contends that we should not address the question of whether he is a "natural born citizen" because it presents a non-justiciable political question. He contends that this doctrine applies because the question of whether a candidate is eligible to take office as President of the United States is within the purview of the Electoral College or the United States Congress.

The political question doctrine is invoked only when the framers of the Constitution made clear their intention that the judiciary abstain from resolving a particular question of constitutional interpretation. In *Zivotofsky ex rel.*

the President, the votes shall be taken by states, the representation from each state having one vote; a quorum for this purpose shall consist of a member or members from two-thirds of the states, and a majority of all the states shall be necessary to a choice. And if the House of Representatives shall not choose a President whenever the right of choice shall devolve upon them, before the fourth day of March next following, then the Vice-President shall act as President, as in the case of the death or other constitutional disability of the President.--The person having the greatest number of votes as Vice-President, shall be the Vice-President, if such number be a majority of the whole number of Electors appointed, and if no person have a majority, then from the two highest numbers on the list, the Senate shall choose the Vice-President; a quorum for the purpose shall consist of two-thirds of the whole number of Senators, and a majority of the whole number shall be necessary to a choice. But no person constitutionally ineligible to the office of President shall be eligible to that of Vice-President of the United States.

U.S. CONST. amend. XII.

4

*Zivotofsky v. Clinton*, the United States Supreme Court addressed this doctrine, stating that:

> In general, the Judiciary has a responsibility to decide cases properly before it, even those it "would gladly avoid." *Cohens v. Virginia*, 6 Wheat. 264, 404, 5 L. Ed. 257 (1821). Our precedents have identified a narrow exception to that rule, known as the "political question" doctrine. *See, e.g., Japan Whaling Assn. v. American Cetacean Soc.*, 478 U.S. 221, 230, 106 S. Ct. 2860, 92 L. Ed.2d 166 (1986). We have explained that a controversy "involves a political question . . . where there is 'a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it.'" *Nixon v. United States*, 506 U.S. 224, 228, 113 S. Ct. 732, 122 L. Ed. 2d 1 (1993) (quoting *Baker v. Carr*, 369 U.S. 186, 217, 82 S.Ct. 691, 7 L. Ed. 2d 663 (1962)). In such a case, we have held that a court lacks the authority to decide the dispute before it.

132 S. Ct. 1421, 1427, 182 L. Ed. 2d 423 (2012); *see also Baker v. Carr*, 369 U.S. 186, 82 S. Ct. 691, 7 L. Ed. 2d 663 (1962); *Sweeney v. Tucker*, 375 A.2d 698 (Pa. 1977).

The political question doctrine should not be invoked then unless it is clear that a court is incapable of rendering a decision because it would otherwise be plainly inconsistent with *Marbury v. Madison*'s basic assumption that the Constitution is judicially declarable law. 1 Cranch 137, 2 L. Ed. 60 (1803).

5

**B.**

The touchstone in determining whether the political question doctrine applies is whether the resolution of the question has been textually committed to one or the other political branches of the federal government. To glean whether the Framers textually committed to Congress the issue of a person's eligibility to serve as President, the Court turns to Article II, Section 1, clauses 2 and 3 of the United States Constitution as originally adopted, as well as the Twelfth Amendment,[2] which set forth the procedure by which a person was elected to the office of President of the United States. These provisions:

1. vested in the legislatures of the several states, not Congress, the power to "appoint, in such Manner as the Legislature thereof may direct, a Number of Electors, equal to the whole Number of Senators and Representatives to which the State may be entitled."[3]

2. commanded the electors, once selected, to meet in their respective states, and vote by ballot for two persons, and then to transmit their votes to the nation's seat of government.

---

[2] The Twelfth Amendment changed the Electoral College's voting procedure, requiring each elector to cast two ballots: one expressly for President and the other distinctly for Vice President. It reaffirmed Congress's role in counting the ballots, merely revising the procedure to be followed in case none of the candidates obtained a majority of electoral votes. It also added the language, "But no person constitutionally ineligible to the office of President shall be eligible to that of Vice-President of the United States." U.S. CONST. amend. XII. None of these provisions evidences a textually demonstrable constitutional commitment of the issue of Presidential eligibility to Congress.

[3] U.S. CONST. art. II, § 1, cl. 2.

3. commanded, upon receipt, the President of the Senate to open the ballots and count the votes in the presence of the members of the Senate and the House of Representatives.

4. provide that only in the case of a tie, or the absence of a majority, does the Constitution allow Congress to choose the President and Vice President.

As can be seen, the Constitution does not vest the Electoral College with power to determine the eligibility of a Presidential candidate since it only charges the embers of the Electoral College to select a candidate for President and then transmit their votes to the nation's "seat of government." U.S. CONST. amend. XII.

Likewise, Congress has no control over the process by which the President and Vice President are normally chosen, other than the very limited one of determining the day on which the electors were to "give their votes." U.S. CONST. amend. XII. Moreover, this Constitutional design clearly served to insulate the Presidential election process from—not to commit it to—Congress and potential interference. This is evident because the Constitution also decreed that members of Congress may not serve as presidential electors.

Comparison of the provisions regarding Presidential eligibility with those regarding the eligibility of members of Congress further supports this conclusion. With respect to the latter, the Constitution provides that "[e]ach house [of Congress] shall be the Judge of the Elections, Returns, and Qualifications of its own Members," including whether they have the requisite U.S. citizenship required for service in the house to which the person has been elected. U.S. CONST. art. I, §

7

5, cl. 1; *see also* U.S. CONST. art. I, § 2, cl. 2; U.S. CONST. art. I, § 3, cl. 3. No one, then, can serve in Congress without satisfying its internally enforced membership rules.[4] Significantly, no Constitutional provision places such power in Congress to determine Presidential eligibility. Moreover, other than setting forth the bare argument, the Candidate offers no further support for the contrary proposition.

Accordingly, under Article I, Section 1, once the electoral votes are counted and a Presidential candidate has won a majority of the electoral votes, the Constitution does not expressly vest any entity of the federal government with the power to ensure that only persons who are constitutionally eligible will exercise the vital executive power vested in the President. Any one may serve as President so long as he or she has won a majority of the electoral vote, unless held in check by the law of our Constitution as applied by the judicial branch. This analysis shows that determination of the eligibility of a person to serve as President has not been textually committed to Congress.

## C.

As to whether the issue is non-justiciable because it is beyond judicial competence due to a lack of standards to apply, the issue of American citizenship,

---

[4] As a general rule, then, no one can serve in Congress without satisfying the internally enforced membership rules, but even this concept has its limits. In *Powell v McCormack*, 395 U.S. 486, 89 S. Ct. 1944, 23 L. Ed. 2d 491 (1969), the United States Supreme Court rejected an argument that the case ought to be dismissed as presenting a political question. The Court concluded, in a case involving the refusal of the House of Representatives to seat Adam Clayton Powell, that the decision to exclude members was not textually committed to the House--with the exception of the criteria identified in Article I, Section 5 relating to age, citizenship, and state residency. Since the refusal to seat Powell was based on a determination that Powell had acted unethically prior to his election, the Court found the exclusion not authorized by Article I and ordered Powell's seating.

including that of a natural born citizen, has been decided, albeit in other contexts, without difficulty in applying the standards. *See, e.g.*, *Miller v. Albright*, 523 U.S. 420, 423, 118 S. Ct. 1428, 140 L. Ed. 2d 575 (1998); *United States v. Wong Kim Ark*, 169 U.S. 649, 655, 18 S. Ct. 456, 42 L. Ed. 890 (1898).

In *Wong Kim Ark*, a Chinese man born in America to a father and mother, both of whom were Chinese citizens domiciled in the United States, claimed that he was a citizen by birth, not subject to the Chinese exclusion laws. In addressing the merits of his argument, the Supreme Court's analysis began with an exposition of the English common law and a survey on the cases and legal treatises addressing the subject. *Wong Kim Ark*, 169 U.S. at 655-58, 18 S. Ct. at 459-60. The Court then reviewed early American authorities which, it concluded, supported the view that American judges, federal and state, had applied the English rule. *Id.* 169 U.S. at 658-66, 18 S. Ct. at 460-63. The Court held:

> there are none that can constrain or permit the judiciary to refuse to give full effect to the peremptory and explicit language of the [F]ourteenth [A]mendment, which declares and ordains that "all persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States."

*Id.* 169 U.S. at 694, 18 S. Ct. at 474.

Most recently, the Supreme Court applied standards to find that the "Eighth Amendment prohibits certain punishments as a categorical matter. No natural born citizen may be denaturalized." *Hall v. Florida*, 134 S. Ct. 1986, 1992,

9

188 L. Ed. 2d 1007 (2014).  Plainly, this rule could never be applied if the question of natural born citizen were a non-justiciable political question.

Because there is neither textually demonstrable constitutional commitment entrusting the determination of a person's eligibility to be President to the Electoral College or Congress nor a lack of a judicially discoverable and manageable standards for resolving the issue, the political question doctrine does not apply in this case.  As such, the Court will proceed to address the merits of the claim.

**D.**

Article II, Section 1, clause 4 of the United States Constitution provides:

> No Person except a natural born Citizen, or a Citizen of the United States, at the time of the Adoption of this Constitution, shall be eligible to the Office of President[.]

U.S. CONST. art. II, § 1, cl. 4.

The Constitution does not define the term "natural born citizen," nor was it discussed during the debates at the Constitutional Convention of 1787, and the Supreme Court of the United States has never addressed its meaning within the specific context of a challenge to the eligibility of a candidate.  Because of the

10

paucity of both constitutional history and legal precedent, the meaning of a "natural born citizen" has been the subject of much dispute.

The framework for addressing who is natural born citizen within the meaning of Article II, Section 1 centers on the circumstances of one's birth. Here, Objector contends that a person must be born within the geographical boundaries of the United States to fall within the definition and suggests that this Court interpret Article II, Section 1 of the Constitution as requiring Jus soli ("law of the soil") citizenship—that is, citizenship vested in a person based on the location of his or her birth, regardless of the parents' citizenship status. Conversely, the Candidate contends that one is a natural born citizen, regardless if born outside of the United States, where one of his parents is a United States citizen, thereby vesting him with citizenship at birth. This type of citizenship is known as Jus sanguinis ("law of the blood") citizenship and inheres in a person based on his ancestry.

This uncertainty has led to questions of eligibility to hold that office each time a person who runs for President is not born on American soil or, for that matter, is born on American soil to non-citizens. It was argued that Republican nominee Charles Evans Hughes, who was born in the United States to non-citizen parents, was not a natural born citizen. Breckinridge Long, *Is Mr. Charles Evans Hughes a "Natural Born Citizen" Within the Meaning of the Constitution?,* 49 CHI. LEGAL NEWS 146 (1916). When Senator John McCain ran for President in 2008, arguments were made that he was not a natural born citizen because he was born outside the United States on a U.S. military base in the Panama Canal Zone to

11

a U.S. citizen parent. Gabriel J. Chin, *Why Senator John McCain Cannot Be President: Eleven Months and a Hundred Yards Short of Citizenship*, 107 MICH. L. REV. First Impressions 1, app. A at 19-21 (2008). Governor George Romney's eligibility for the Presidency was also questioned because was born in Mexico to U.S. citizen parents. Isidor Blum, *Is Gov. George Romney Eligible to Be President?,* N.Y.L.J., Oct. 16, 1967, at 1. Aside from the "birther's" belief that he was not born in the United States, President Obama's eligibility was challenged on the basis that even if he was born in Hawaii, he was not a "natural born citizen" because his father was not a U.S. citizen.

Charles Gordon, then the General Counsel of the United States Immigration and Naturalization Service, attempted to answer this question. *See* Charles Gordon, *Who Can Be President of the United States: the Unresolved Enigma*, 28 MD. L. REV. 1 (1968). He followed the United States Supreme Court's suggestion that because "[t]he Constitution does not, in words, say who shall be natural-born citizens[,] [r]esort must be had elsewhere," namely to common law existing at the time of the Founding Fathers to ascertain the meaning based on reference to the nomenclature with which they were familiar. *Minor v. Happersett*, 88 U.S. 162, 167, 22 L. Ed. 627 (1874) (suggesting this approach to interpretation but ultimately not reaching the issue).

Having surveyed most of the common law in effect at the time the Constitution was adopted, as well as other historical, statutory, and constitutional sources, Gordon concluded that:

1. The reference to "natural-born" in the presidential qualification clause must be considered in the light of the English usage, well known to the Framers of the Constitution. The English common law, particularly as it had been declared or modified by statute, accorded full status as natural-born subjects to persons born abroad to British subjects.

2. Although the evidence of intent is slender, it seems likely that the natural-born qualification was intended only to exclude those who were not born American citizens, but acquired citizenship by naturalization. The Framers were well aware of the need to assure full citizenship rights to the children born to American citizens in foreign countries. Their English forebears had made certain that the rights of such children were protected, and it is hardly likely that the Framers intended to deal less generously with their own children. The evidence, although not overwhelming, unquestionably points in the direction of such generosity.

3. This gloss of prior history and usage is not dulled, I believe, by the Naturalization Act of 1790 or by the fourteenth amendment. The 1790 act, enacted soon after the Constitutional Convention, recognized such persons as natural-born citizens. The fourteenth amendment, adopted primarily to confirm the full citizenship denied to Negroes by the *Dred Scott* decision, did not refer to "natural-born" citizens, did not purport to limit or define the presidential qualification clause of the Constitution, and did not, in my estimation, bar a construction of that clause to include children born abroad to American parents.

Gordon, *supra*, at 31-32. Gordon admitted, though, that the evidence for his conclusion is not overwhelming, and that his research only "points in the direction" of his ultimate conclusions. *Id.* at 32.

13

Recently, the Congressional Research Service (CRS)[5] reached the same conclusion in its January 2016 report,[6] by which it updated its 2011 report authored by Jack Maskell, entitled "Qualifications for President and the 'Natural Born' Citizenship Eligibility Requirement."  JACK MASKELL, CONG. RESEARCH SERV., R42097, QUALIFICATIONS FOR PRESIDENT AND THE "NATURAL BORN" CITIZENSHIP ELIGIBILITY REQUIREMENT (2011).  The original report was apparently prompted by continuing questions regarding the meaning of the term "natural born citizen" arising out of Senator McCain's 2008 candidacy.  It contains an exhaustive analysis of the historical and legal background, both common law and statutory, on this issue.  The summary of that report states, in relevant part:

> The term "natural born" citizen is not defined in the Constitution, and there is no discussion of the term evident in the notes of the Federal Convention of 1787.
> The use of the phrase in the Constitution may have derived from a suggestion in a letter from John Jay to George Washington during the Convention expressing concern about having the office of Commander-in-Chief "devolve on, any but a natural born Citizen," as there were fears at that time about wealthy European aristocracy or royalty coming to America, gaining citizenship, and then buying and scheming their way to the presidency without long-standing loyalty to the nation.  At the time of independence, and at the time of the framing of the Constitution, the term "natural born"

---

[5] The Congressional Research Service (CRS) is a legislative branch agency within the Library of Congress which works exclusively for the United States Congress, providing policy and legal analysis to committees and members of both the House and Senate.

[6] JACK MASKELL, CONG. RESEARCH SERV., R42097, QUALIFICATIONS FOR PRESIDENT AND THE "NATURAL BORN" CITIZENSHIP ELIGIBILITY REQUIREMENT (2016), *available at* http://www.scribd.com/doc/295658863/Qualifications-for-President-and-the-Natural-Born-Citizenship-Eligibility-Requirement-Congressional-Research-Service-R42097-2016#scribd.

with respect to citizenship was in use for many years in the American colonies, and then in the states, from British common law and legal usage. Under the common law principle of jus soli (law of the soil), persons born on English soil, even of two alien parents, were "natural born" subjects and, as noted by the Supreme Court, this "same rule" was applicable in the American colonies and "in the United States afterwards, and continued to prevail under the Constitution . . ." with respect to citizens. In textual constitutional analysis, it is understood that terms used but not defined in the document must, as explained by the Supreme Court, "be read in light of British common law" since the Constitution is "framed in the language of the English common law."

In addition to historical and textual analysis, numerous holdings and references in federal (and state) cases for more than a century have clearly indicated that those born in the United States and subject to its jurisdiction (i.e., not born to foreign diplomats or occupying military forces), even to alien parents, are citizens "at birth" or "by birth," and are "natural born," as opposed to "naturalized," U.S. citizens. There is no provision in the Constitution and no controlling American case law to support a contention that the citizenship of one's parents governs the eligibility of a native born U.S. citizen to be President.

Although the eligibility of native born U.S. citizens has been settled law for more than a century, there have been legitimate legal issues raised concerning those born outside of the country to U.S. citizens. From historical material and case law, it appears that the common understanding of the term "natural born" in England and in the American colonies in the 1700s may have included both the strict common law meaning as born in the territory (jus soli), as well as the statutory laws adopted in England since at least 1350, which included children born abroad to British fathers (jus sanguinis, the law of descent).

15

The weight of legal and historical authority indicates that the term "natural born" citizen would mean a person who is entitled to U.S. citizenship "by birth" or "at birth," either by being born "in" the United States and under its jurisdiction, even those born to alien parents; by being born abroad to U.S. citizen-parents; or by being born in other situations meeting legal requirements for U.S. citizenship "at birth." Such term, however, would not include a person who was not a U.S. citizen by birth or at birth, and who was thus born an "alien" required to go through the legal process of "naturalization" to become a U.S. citizen.

*Id.* at Summary (unnumbered).

Moreover, Paul Clement and Neal Katyal, both former Solicitor Generals of the United States, arrived at the same conclusion in a more succinct manner, determining that a U.S. citizen at birth is a natural born citizen and constitutionally eligible to serve as President. Paul Clement & Neal Katyal, *On the Meaning of "Natural Born Citizen*," 128 HARV. L. REV. 161 (2015). They reason, in relevant part:[7]

The Constitution directly addresses the minimum qualifications necessary to serve as President. In addition to requiring thirty-five years of age and fourteen years of residency, the Constitution limits the presidency to "a natural born Citizen." [U.S. CONST. art. II, §1, cl. 5.] All the sources routinely used to interpret the Constitution confirm that the phrase "natural born Citizen" has a specific meaning: namely, someone who was a U.S. citizen at birth with no need to go through a naturalization proceeding at some later time. And

---

[7] For convenience, the citations contained in footnotes were placed in the body of the text.

Congress has made equally clear from the time of the framing of the Constitution to the current day that, subject to certain residency requirements on the parents, someone born to a U.S. citizen parent generally becomes a U.S. citizen without regard to whether the birth takes place in Canada, the Canal Zone, or the continental United States. [*See, e.g.*, 8 U.S.C. §1401(g) (2012); Immigration and Nationality Act of 1952, Pub. L. No. 82-414, §303, 66 Stat. 163, 236-37; Act of May 24, 1934, Pub. L. No. 73-250, 48 Stat. 797.]

While some constitutional issues are truly difficult, with framing-era sources either nonexistent or contradictory, here, the relevant materials clearly indicate that a "natural born Citizen" means a citizen from birth with no need to go through naturalization proceedings. The Supreme Court has long recognized that two particularly useful sources in understanding constitutional terms are British common law [*See Smith v. Alabama*, 124 U.S. 465, 478 (1888)] and enactments of the First Congress. [*See Wisconsin v. Pelican Ins. Co.*, 127 U.S. 265, 297 (1888).] Both confirm that the original meaning of the phrase "natural born Citizen" includes persons born abroad who are citizens from birth based on the citizenship of a parent.

As to the British practice, laws in force in the 1700s recognized that children born outside of the British Empire to subjects of the Crown were subjects themselves and explicitly used "natural born" to encompass such children. [S*ee United States v. Wong Kim Ark*, 169 U.S. 649, 655-72 (1898).] These statutes provided that children born abroad to subjects of the British Empire were "natural-born Subjects . . . to all Intents, Constructions, and Purposes whatsoever." [7 Ann., c. 5, §3 (1708); *see also* British Nationality Act, 1730, 4 Geo. 2, c. 21.] The Framers, of course, would have been intimately familiar with these statutes and the way they used terms like "natural born," since the statutes were binding law in the colonies before the Revolutionary War. They were also well documented in Blackstone's Commentaries [*See* 1 WILLIAM BLACKSTONE, COMMENTARIES *354-63], a text widely

circulated and read by the Framers and routinely invoked in interpreting the Constitution.

No doubt informed by this longstanding tradition, just three years after the drafting of the Constitution, the First Congress established that children born abroad to U.S. citizens were U.S. citizens at birth, and explicitly recognized that such children were "natural born Citizens." The Naturalization Act of 1790, Ch. 3, 1 Stat. 103 (repealed 1795), provided that "the children of citizens of the United States, that may be born beyond sea, or out of the limits of the United States, shall be considered as natural born citizens: Provided, That the right of citizenship shall not descend to persons whose fathers have never been resident in the United States . . . ." [*Id.* at 104 (emphasis omitted).] The actions and understandings of the First Congress are particularly persuasive because so many of the Framers of the Constitution were also members of the First Congress. That is particularly true in this instance, as eight of the eleven members of the committee that proposed the natural born eligibility requirement to the Convention served in the First Congress and none objected to a definition of "natural born Citizen" that included persons born abroad to citizen parents. [*See* Christina S. Lohman, Pres*idential Eligibility: The Meaning of the Natural-Born Citizen Clause*, 36 GONZ. L. REV. 349, 371 (2000/01).]

The proviso in the Naturalization Act of 1790 underscores that while the concept of "natural born Citizen" has remained constant and plainly includes someone who is a citizen from birth by descent without the need to undergo naturalization proceedings, the details of which individuals born abroad to a citizen parent qualify as citizens from birth have changed. The pre-Revolution British statutes sometimes focused on paternity such that only children of citizen fathers were granted citizenship at birth. [*See, e.g.*, British Nationality Act, 1730, 4 Geo. 2, c. 21.] The Naturalization Act of 1790 expanded the class of citizens at birth to include children born abroad of citizen mothers as long as the father had at least been resident in the United States at

some point. But Congress eliminated that differential treatment of citizen mothers and fathers before any of the potential candidates in the current presidential election were born. Thus, in the relevant time period, and subject to certain residency requirements, children born abroad of a citizen parent were citizens from the moment of birth, and thus are "natural born Citizens."

The original meaning of "natural born Citizen" also comports with what we know of the Framers' purpose in including this language in the Constitution. The phrase first appeared in the draft Constitution shortly after George Washington received a letter from John Jay, the future first Chief Justice of the United States, suggesting:

> [W]hether it would not be wise & seasonable to provide a . . . strong check to the admission of Foreigners into the administration of our national Government; and to declare expressly that the Command in chief of the american [sic] army shall not be given to, nor devolve on, any but a natural born Citizen.

[Letter from John Jay to George Washington (July 25, 1787), in 3 THE RECORDS OF THE FEDERAL CONVENTION OF 1787.]

As recounted by Justice Joseph Story in his famous Commentaries on the Constitution, the purpose of the natural born Citizen clause was thus to "cut[] off all chances for ambitious foreigners, who might otherwise be intriguing for the office; and interpose[] a barrier against those corrupt interferences of foreign governments in executive elections." [3 JOSEPH STORY, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES §1473, at 333 (1833).] The Framers did not fear such machinations from those who were U.S. citizens from birth just because of the happenstance of a foreign birthplace. Indeed, John Jay's own children were born abroad while he served on diplomatic assignments, and it would be absurd to conclude that Jay proposed to exclude

19

his own children, as foreigners of dubious loyalty, from presidential eligibility. [*See* Michael Nelson, *Constitutional Qualifications for President*, 17 PRESIDENTIAL STUD. Q. 383, 396 (1987).]

While the field of candidates for the next presidential election is still taking shape, at least one potential candidate, Senator Ted Cruz, was born in a Canadian hospital to a U.S. citizen mother. [*See* Monica Langley, *Ted Cruz, Invoking Reagan, Angers GOP Colleagues But Wins Fans Elsewhere*, WALL ST. J. (Apr. 18, 2014, 11:36 PM).] Despite the happenstance of a birth across the border, there is no question that Senator Cruz has been a citizen from birth and is thus a "natural born Citizen" within the meaning of the Constitution. Indeed, because his father had also been resident in the United States, Senator Cruz would have been a "natural born Citizen" even under the Naturalization Act of 1790.

****

There are plenty of serious issues to debate in the upcoming presidential election cycle. The less time spent dealing with specious objections to candidate eligibility, the better. Fortunately, the Constitution is refreshingly clear on these eligibility issues. To serve, an individual must be at least thirty-five years old and a "natural born Citizen." Thirty-four and a half is not enough and, for better or worse, a naturalized citizen cannot serve. But as Congress has recognized since the Founding, a person born abroad to a U.S. citizen parent is generally a U.S. citizen from birth with no need for naturalization. And the phrase "natural born Citizen" in the Constitution encompasses all such citizens from birth. Thus, an individual born to a U.S. citizen parent--whether in California or Canada or the Canal Zone--is a U.S. citizen from birth and is fully eligible to serve as President if the people so choose.

*Id.* at 161-64.

20

Others have made the case that to be a natural born citizen under Article II, Section 1, one must be born in the United States, except in certain instances. Mary McManamon, Professor of Law at Widener University School of Law, criticized the scholarship of those cited above and many more, citing provisions of English common law, "statements by early American jurists," and selected passages from Blackstone, for the proposition that in the eyes of the Framers, a presidential candidate must be born in the United States. Mary McManamon, *The Natural Born Citizen Clause as Originally Understood*, 64 CATH. U. L. REV. 317, 343 (2015). She concludes that aside from children born to U.S. ambassadors or soldiers in hostile armies, all natural-born citizens must be born in the United States. Undoubtedly, this is a minority view among legal scholars.

Having extensively reviewed all articles cited in this opinion, as well as many others, this Court holds, consistent with the common law precedent and statutory history, that a "natural born citizen" includes any person who is a United States citizen from birth.

Accordingly, because he was a citizen of the United States from birth, Ted Cruz is eligible to serve as President of the United States, and the objection filed by Carmen Elliott to the Nomination Petition of Ted Cruz is denied.

_____

DAN PELLEGRINI, Senior Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Carmon Elliott,                           :
                    Petitioner            :
                                          :
          v.                              :   No. 77 M.D. 2016
                                          :
Ted Cruz,                                 :
                    Respondent            :


**O R D E R**


AND NOW, this 10<u>th</u> day of  March, 2016, the petition to set aside the nomination of Ted Cruz as a Candidate for the Republican Nomination for President of the United States is denied.  The Secretary of the Commonwealth is directed to certify the name of Ted Cruz to the proper officials for inclusion on the ballot of the Republican Primary to be held on April 26, 2016.  Each party is to bear its own costs.


_____
DAN PELLEGRINI, Senior Judge