IN THE

# SUPREME COURT OF THE STATE OF ARIZONA

---

**STATE OF ARIZONA,**
*Appellee,*

*v.*

**ANDRE LEE JUWAUN MAESTAS,**
*Appellant.*

---

No. CR-17-0193-PR
Filed May 23, 2018

---

Appeal from the Superior Court in Maricopa County
The Honorable Dean M. Fink, Judge
No. CR 2014-127252
**VACATED IN PART**

Opinion of the Court of Appeals, Division One
242 Ariz. 194 (App. 2017)
**VACATED**

---

COUNSEL:

Mark Brnovich, Arizona Attorney General, Dominic E. Draye (argued), Solicitor General, Joseph T. Maziarz, Chief Counsel, Criminal Appeals Section, Adele Ponce, Assistant Attorney General, Phoenix, Attorneys for State of Arizona

Thomas W. Dean (argued), Thomas W. Dean Attorney at Law, Phoenix, Attorney for Andre Lee Juwaun Maestas

David J. Euchner, Sarah L. Mayhew (argued), Tucson, Attorneys for Amicus Curiae Arizona Attorneys for Criminal Justice

Lee Phillips, Law Offices of Lee Phillips PC, Flagstaff, Attorney for Amicus Curiae Students for Sensible Drug Policy

—————————

JUSTICE PELANDER authored the opinion of the Court, in which CHIEF JUSTICE BALES, VICE CHIEF JUSTICE BRUTINEL, and JUSTICES TIMMER and LOPEZ, and JUDGE ECKERSTROM joined.\* JUSTICE BOLICK concurred.

—————————

JUSTICE PELANDER, opinion of the Court:

**¶1**         The Arizona Medical Marijuana Act ("AMMA"), enacted by voters as Proposition 203 in 2010, generally permits qualified AMMA cardholders to possess a limited amount of marijuana and, with certain exceptions and limitations, immunizes their AMMA-compliant possession or use from "arrest, prosecution or penalty in any manner." A.R.S. § 36-2811(B). Among its limitations, the AMMA prohibits the possession or use of medical marijuana at certain specified locations. A.R.S. § 36-2802(B). In 2012, the Arizona Legislature added another location by enacting a statute under which "a person, including [a qualified AMMA cardholder], may not lawfully possess or use marijuana on the campus of any public university, college, community college or postsecondary educational institution." A.R.S. § 15-108(A). Because that statute violates Arizona's Voter Protection Act ("VPA") with respect to AMMA-compliant marijuana possession or use, we hold it unconstitutional as applied to the university student/cardholder in this case.

## I.   BACKGROUND

**¶2**         In March 2014, an Arizona State University police officer arrested Andre Lee Juwaun Maestas after the officer observed Maestas sitting in a road near Maestas's dormitory on the university campus. The officer searched Maestas and found a valid AMMA registry identification card in Maestas's wallet. After Maestas admitted that he had marijuana in his dorm room, the officer obtained a search warrant, searched Maestas's dorm room, and found two envelopes containing 0.4 grams of marijuana. (The AMMA provides that an "[a]llowable amount of marijuana" is "[t]wo-

———————————

\* Justice Andrew W. Gould has recused himself from this case. Pursuant to article 6, section 3 of the Arizona Constitution, the Honorable Peter J. Eckerstrom, Chief Judge of the Arizona Court of Appeals, Division Two, was designated to sit in this matter.

and-one-half ounces of usable marijuana." A.R.S. § 36-2801(1)(a)(i). Maestas's 0.4 grams of marijuana is roughly equivalent to 0.014 ounces.)

¶3 The State charged Maestas with obstructing a public thoroughfare and possession of marijuana. Before trial, Maestas moved to dismiss the marijuana-possession charge, arguing that his possession was AMMA-compliant and he was therefore immune from prosecution under § 36-2811(B). The State opposed the motion, arguing that Maestas's AMMA-compliant possession of marijuana was nevertheless unlawful under § 15-108(A), which prohibits even AMMA cardholders from possessing marijuana on public college and university campuses. The superior court denied Maestas's motion, convicted him on both counts after a bench trial, imposed a fine on the marijuana-possession charge, and placed him on probation for one year.

¶4 The court of appeals vacated Maestas's conviction for possession of marijuana and held that § 15-108(A) is unconstitutional under the VPA. *State v. Maestas*, 242 Ariz. 194, 198 ¶ 16 (App. 2017). As a threshold matter, the court ruled that the constitutionality of § 15-108(A) is a justiciable question because the political question doctrine is inapplicable here. *Id.* at 196–97 ¶¶ 9–10. On the merits, the court reasoned that the VPA's requirements apply to § 15-108(A) because the statute amends the AMMA by re-criminalizing AMMA "cardholders' marijuana possession on college and university campuses." *Id.* at 197 ¶¶ 12–13. The court further concluded that § 15-108(A) violates the VPA because the AMMA's purpose is to protect AMMA "cardholders from criminal and other penalties," *id.* at 196 ¶ 8, and § 15-108(A) does not further that purpose but rather "eliminates some of [the AMMA's] protections," *id.* at 197 ¶ 13.

¶5 We granted review because § 15-108(A)'s validity presents a recurring legal question of statewide importance. We have jurisdiction under article 6, section 5(3), of the Arizona Constitution and A.R.S. § 12-120.24.

## II. DISCUSSION

¶6 We review the constitutionality of a statute de novo. *Biggs v. Betlach*, 243 Ariz. 256, 258 ¶ 9 (2017). "When the statute in question involves no fundamental constitutional rights or distinctions based on suspect classifications, we presume the statute is constitutional and will uphold it unless it clearly is not." *Cave Creek Unified Sch. Dist. v. Ducey*, 233 Ariz. 1, 5 ¶ 11 (2013).

### A.

**¶7**        The State first contends that the constitutionality of § 15-108(A) under the VPA is a non-justiciable political question because the AMMA "authorizes universities to restrict and penalize cardholders to protect federal funding, and the necessity of such measures" is delegated to the legislature.  We disagree.

**¶8**        "The Arizona Constitution entrusts some matters solely to the political branches of government, not the judiciary."  *Ariz. Indep. Redistricting Comm'n v. Brewer*, 229 Ariz. 347, 351 ¶ 16 (2012); *see also* Ariz. Const. art. 3 (providing that the three departments of Arizona's government "shall be separate and distinct, and no one of such departments shall exercise the powers properly belonging to either of the others").

**¶9**        Flowing from "the basic principle of separation of powers," a non-justiciable political question is presented when "there is a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it."  *Kromko v. Ariz. Bd. of Regents*, 216 Ariz. 190, 192 ¶¶ 11–12 (2007) (internal quotation marks omitted) (quoting *Nixon v. United States*, 506 U.S. 224, 228 (1993)); *see also Forty-Seventh Legislature v. Napolitano*, 213 Ariz. 482, 485 ¶ 7 (2006) (defining "[p]olitical questions" as "decisions that the constitution commits to one of the political branches of government and raise issues not susceptible to judicial resolution according to discoverable and manageable standards").  Neither aspect of this test is present here.

**¶10**        The State argues that there is a "textually demonstrable constitutional commitment of the issue" to the legislature, *Kromko*, 216 Ariz. at 192 ¶ 11, because the Arizona Constitution commits to that branch the power to establish and maintain "a general and uniform public school system," which includes universities, Ariz. Const. art. 11, § 1(A)(6).  But the legislature's power to maintain universities is limited by the VPA.

**¶11**        As relevant here, the Arizona Constitution was amended in 1998 when voters approved the VPA to expressly limit the legislature's "authority to amend measures approved by voters in initiative elections." *Ariz. Early Childhood Dev. & Health Bd. v. Brewer*, 221 Ariz. 467, 469 ¶ 6 (2009); *see also* Ariz. Const. art. 4, pt. 1, § 1(6)(C) (providing that the legislature may only amend a voter initiative if "the amending legislation furthers the purposes of such measure and at least three-fourths of the members of each house of the legislature . . . vote to amend such measure").  Adopting the State's argument would mean that, notwithstanding the VPA's limitations on the legislature's power, courts could not adjudicate any VPA challenge

4

to a law enacted in a subject area over which the legislature exercised power given to it by the constitution. Such an interpretation would render the VPA meaningless. Accordingly, there is not a "textually demonstrable constitutional commitment of the issue" presented here, i.e., whether § 15-108(A) is constitutional under the VPA, to "a coordinate political department." *Kromko*, 216 Ariz. at 192 ¶ 11 (internal quotation marks omitted) (quoting *Nixon*, 506 U.S. at 228).

¶12 In addition, there is not "a lack of judicially discoverable and manageable standards for resolving" this issue. *Id.* We have ruled on VPA challenges in the past, *see, e.g.*, *Cave Creek Unified Sch. Dist.*, 233 Ariz. at 4–8 ¶¶ 8–25; *Brewer*, 221 Ariz. at 469–72 ¶¶ 5–18, and no legal obstacle prevents us from resolving the challenge raised here. Accordingly, we conclude that the issue presented is justiciable.

### B.

¶13 The State next contends that the VPA's requirements do not apply to § 15-108(A) because the legislature did not amend the AMMA when it enacted § 15-108(A). The State reasons that the AMMA "expressly authorizes restrictions for cardholders on university campuses" and "expressly authorizes penalties in order to assure continued access to federal funding." Alternatively, the State argues that even if the VPA's requirements apply to § 15-108(A), the legislature complied with those requirements because at least three-fourths of the members of each chamber voted to enact § 15-108(A), and that law is consistent with the AMMA when the statutory scheme is viewed as a whole. We disagree.

¶14 The VPA limits the legislature's power to amend, repeal, or supersede voter initiatives. *See* Ariz. Const. art. 4, pt. 1, § 1(6)(B)–(C), (14). A threshold question, therefore, is whether the legislature amended, repealed, or superseded the AMMA when it enacted § 15-108(A). It is undisputed that § 15-108(A) did not repeal or supersede the AMMA, but the parties disagree about whether § 15-108(A) amends it.

¶15 The AMMA specifies the circumstances under which the legislature may impose "civil, criminal or other penalties" when a person, including a qualified AMMA cardholder, possesses or uses marijuana. A.R.S. § 36-2802(B). Specifically, the AMMA "does not authorize any person" to possess or use marijuana in the following locations: "[o]n a school bus," "[o]n the grounds of any preschool or primary or secondary school," and "[i]n any correctional facility." § 36-2802(B)(1)–(3). In general, when the legislature (or voters) expressly prescribes a list in a statute (or

initiative), "we assume the exclusion of items not listed." *State v. Ault*, 157 Ariz. 516, 519 (1988). Because the AMMA sets forth a list of locations where the legislature may impose "civil, criminal or other penalties" when a person possesses or uses marijuana, § 36-2802, and because that list does not include college and university campuses (unlike pre-, primary-, and secondary-school grounds), we assume that the voters did not intend to criminalize AMMA-compliant possession or use of marijuana on public college and university campuses.

¶16　　　By its terms, § 15-108(A) amends the AMMA by adding a location to the AMMA's list of specified locations where the legislature may impose "civil, criminal or other penalties" for a person's possession or use of marijuana otherwise allowed under the AMMA. § 36-2802. Indeed, § 15-108(A) begins by stating that "[i]n addition to the limitations prescribed in" § 36-2802(B), a person "may not lawfully possess or use marijuana on the campus of any public university, college, community college or postsecondary educational institution." Consequently, the legislature amended the AMMA when it enacted § 15-108(A) because that statute makes AMMA-compliant possession or use of marijuana on public college and university campuses criminal.

¶17　　　Although this conclusion is apparent from the statute's terms, it is also bolstered by § 15-108's legislative history. When that proposed law was introduced in the legislature as House Bill 2349, the Bill Summary noted that it would "require the affirmative vote of at least three-fourths of the members of each house of the Legislature" to be enacted. Ariz. H.B. Summary for H.B. 2349, 50th Leg., 2d Reg. Sess. (Jan. 23, 2012). With one exception that is inapplicable here, *see* Ariz. Const. art. 9, § 22(A) (requiring three-fourths vote of legislature to override governor's veto of revenue-raising act), such a requirement applies only when a legislative enactment is subject to the VPA. Accordingly, when House Bill 2349 was introduced, the bill's sponsor presumably understood that its provisions would amend the AMMA if enacted.

¶18　　　For the foregoing reasons, we conclude that the VPA's restrictions apply to the legislature's enactment of § 15-108(A) because it amends the AMMA. We next turn to whether the legislature complied with the VPA's requirements when it enacted § 15-108(A).

¶19　　　To comply with the VPA, the legislature may constitutionally amend a voter initiative only if "the amending legislation furthers the purposes of such measure and at least three-fourths of the members of each house of the legislature . . . vote to amend such measure." Ariz. Const. art.

4, pt. 1, § 1(6)(C). Here, "at least three-fourths of the members of each house of the legislature" voted to enact § 15-108(A). *Id.* The dispositive question, therefore, is whether § 15-108(A) "furthers the purposes" of the AMMA. *Id.* It does not.

**¶20**    The AMMA "permits those who meet statutory conditions to [possess and] use medical marijuana." *Reed-Kaliher v. Hoggatt*, 237 Ariz. 119, 122 ¶ 7 (2015). "Because marijuana possession and use are otherwise illegal in Arizona, . . . the drafters [of the AMMA] sought to ensure that those using marijuana pursuant to [the] AMMA would not be penalized for such use." *Id.* Indeed, this purpose is made explicit in the AMMA's voter initiative statements. *See* Proposition 203 § 2(G) (2010) (stating that the purpose of the AMMA "is to protect patients with debilitating medical conditions . . . from arrest and prosecution, [and] criminal and other penalties . . . if such patients engage in the medical use of marijuana"). Criminalizing AMMA-compliant marijuana possession or use on public college and university campuses plainly does not further the AMMA's primary purpose as expressed in those statements supporting the voter initiative. Section 15-108(A) does not "protect" qualifying AMMA cardholders from criminal penalties arising from AMMA-compliant marijuana possession or use on public college and university campuses, but rather subjects them to such penalties. Therefore, because § 15-108(A) does not further the purpose of the AMMA, we hold that § 15-108(A) violates the VPA as applied to AMMA-compliant marijuana possession or use.

**¶21**    In so holding, we disagree with the State that the AMMA's anti-discrimination provision, A.R.S. § 36-2813(A), authorizes the legislature to criminalize AMMA-compliant marijuana possession or use on public college and university campuses to preserve federal funding. Section 36-2813(A) provides that a "school" may "penalize a person solely for his status as a cardholder" only if "failing to do so would cause the school . . . to lose a monetary or licensing related benefit under federal law or regulations."

**¶22**    By its terms, § 36-2813(A) does not authorize the legislature to criminalize AMMA-compliant marijuana possession or use on public college and university campuses for two reasons. First, § 36-2813(A) authorizes a "school" to penalize a cardholder to preserve federal funding. But a school is not authorized to enact criminal laws. Therefore, any authority that is vested in a school under this statute does not extend to criminalizing AMMA-compliant marijuana possession or use.

¶23        Second, even if § 36-2813(A) did authorize the legislature to take some action to preserve federal funding, criminalizing AMMA-compliant marijuana possession or use is impermissible because it is unnecessary to achieve the statute's purpose.  The State has not shown that failing to "penalize a person solely for his status as a cardholder . . . *would cause*" a school to lose federal funding.  § 36-2813(A) (emphasis added).  A university can comply with federal funding requirements by adopting and implementing "a program to prevent the use of illicit drugs."  20 U.S.C. § 1011i(a).  The program must prohibit "the unlawful possession . . . of illicit drugs," *id.* § 1011i(a)(1)(A), and describe "the applicable legal sanctions under local, State, or Federal law for the unlawful possession . . . of illicit drugs," *id.* § 1011i(a)(1)(B), which may include "referral for prosecution," *id.* § 1011i(a)(1)(E).[1]   But a university does not have to guarantee prosecution for violations of its program.  And it can refer violations of its program to the federal prosecutor.  The State has not shown that a university would lose (or has lost) federal funding if a state prosecutor did not prosecute violations of the university's program.  Consequently, we conclude that A.R.S. § 36-2813(A) does not authorize the legislature to criminalize AMMA-compliant marijuana possession or use on public university and college campuses to preserve federal funding.

## III.    CONCLUSION

¶24        For the reasons stated above, we vacate Maestas's conviction for possession of marijuana.  We also vacate the court of appeals' opinion.

---

[1] Arizona State University seemingly complies with federal law through its anti-drug policy.  *See* Ariz. State Univ., *SSM 106–03: Alcohol and Other Drugs on Campus*, https://www.asu.edu/aad/manuals/ssm/ssm106-03.html (last modified Aug. 1, 2014) (providing that "ASU prohibits the unlawful use, possession, production, manufacture, and distribution of alcohol and other drugs and controlled substances" and that "[a]nyone who violates federal, state, or local law regarding alcohol or other drugs, including the illegal possession of drug paraphernalia, or who otherwise engages in illegal conduct is subject to prosecution and punishment by criminal and civil authorities in addition to disciplinary or administrative sanctions issued by the university").

JUSTICE BOLICK, concurring.

¶25         I agree completely with the Court's opinion but write separately to question our continued adherence to part of the political question doctrine that does not appear to comport with foundational constitutional principles.

¶26         We decide this case based on the familiar doctrine that "a non-justiciable political question is presented when 'there is a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it.'" *Supra* ¶ 9 (quoting *Kromko*, 216 Ariz. at 192 ¶¶ 11–12). For purposes of this opinion, I will refer to the first part of the test as the "textual requirement" and the second as the "prudential requirement." I agree with the Court that the question here survives both parts of the test and therefore presents a justiciable case.

¶27         It appears that we largely adopted the political question doctrine, or at least the prudential requirement, as received wisdom from the United States Supreme Court. *See, e.g.*, *Kromko*, 216 Ariz. at 192–93 ¶¶ 11–12 (citing to United States Supreme Court case law and the "federal political question doctrine"). We should welcome wisdom from any source, but if we embrace it we should make sure it is, indeed, wisdom. The textual requirement, which forbids the judiciary from ruling on matters constitutionally entrusted to the political branches of government, is central to our system of separation of powers. But the judicially created prudential requirement, as a standalone doctrine, does quite the opposite by abdicating the judiciary's central role of constitutional interpretation.

¶28         The textual requirement of the political question doctrine is deeply embedded in our constitutional design, but the prudential requirement is not. The Constitution's framers intended that courts would not decide matters entrusted to other branches of government, but equally intended that the courts and not the other branches would determine respective constitutional boundaries. In *The Federalist No. 78*, Alexander Hamilton articulated a bright line of demarcation between the two, recognizing hegemony of the political branches in matters assigned to their discretion, but recognizing the Constitution as "fundamental law" and that it "belongs to [the judiciary] to ascertain its meaning." *The Federalist No. 78*, at 430 (Alexander Hamilton) (Gideon ed., 2006). Hamilton described the judiciary as "the weakest of the three departments" for it possesses none of the powers assigned to the other branches. *Id.* at 429. But "the courts were designed to be an intermediate body between the people and the

legislature, in order, among other things, to keep the latter within the limits assigned to their authority." *Id.* at 430. By contrast, "[i]f it be said that the legislative body are themselves the constitutional judges of their own powers, . . . it may be answered, that this cannot be the natural presumption, where it is not to be collected from any particular provisions in the constitution." *Id.* Constitutional limits "can be preserved in practice no other way than through the medium of courts of justice, whose duty it must be to declare all acts contrary to the manifest tenor of the constitution void. Without this, all the reservations of particular rights or privileges would amount to nothing." *Id.* at 429.

**¶29** That understanding was reflected in *Marbury v. Madison*, in which the Supreme Court set forth the judiciary's role in constitutional adjudication and first articulated the political question doctrine. 5 U.S. 137, 165–66, 176–78 (1803). The Court recognized that under the Constitution, "the President is invested with certain important political powers, in the exercise of which he is to use his own discretion, and is accountable only to his country in his political character, and to his own conscience." *Id.* at 165–66. Actions pursuant to such discretion "can never be examinable by the courts." *Id.* at 166. But in matters not expressly delegated to the other branches, the Court made clear that the judiciary must interpret constitutional boundaries. *Id.* at 176–78. "It is emphatically the province and duty of the judicial department to say what the law is," and constitutional interpretation "is of the very essence of judicial duty." *Id.* at 177–78.

**¶30** As the Court declared in *Marbury*, "[i]t cannot be presumed that any clause in the constitution is intended to be without effect; and therefore such construction is inadmissible, unless the words require it." *Id.* at 174. Leaving interpretation to the other branches renders constitutional rights and limits "mere surplusage" and "entirely without meaning." *Id.* There are no inkblots in the Constitution. *See* Robert H. Bork, *The Tempting of America* 166 (1990) (examining the Ninth Amendment and concluding that a "provision whose meaning cannot be ascertained is precisely like a provision that is written in Sanskrit or is obliterated past deciphering by an ink blot. No judge is entitled to interpret an ink blot on the ground that there must be something under it."). When the judiciary fails to interpret and enforce constitutional rights and limits, it shrinks from its central duty and drains the Constitution of its intended meaning.

**¶31** The prudential requirement of the political question doctrine traces its origins to New Deal jurisprudence but "was given its canonical modern formulation" in *Baker v. Carr*, 369 U.S. 186 (1962). *See* Joshua S.

Stillman, Note, *The Costs of "Discernible and Manageable Standards" in* Vieth *and Beyond*, 84 N.Y.U. L. Rev. 1292, 1298 (2009). In *Baker*, the Supreme Court set forth six bases for non-justiciability of a case as presenting a political question. 369 U.S. at 217. The first two are whether there is "a textually demonstrable constitutional commitment of the issue to a coordinate political department" or "a lack of judicially discoverable and manageable standards for resolving it." *Id.* While the latter four are rarely invoked as bases for non-justiciability, the first two typically are paired as a unified test, as we have applied it here. But the two requirements are in considerable tension. The first instructs the courts, quite properly, not to intrude in a matter constitutionally entrusted to another branch of government. The second implies that the matter is *not* constitutionally entrusted to another branch, but that for prudential reasons we should not decide it anyway, leading to the inevitable consequence that another branch of government will decide the constitutional limits of its own power. As noted above, the framers invested the judiciary with the duty to make sure that would never happen. *See Marbury*, 5 U.S. at 176–78.

¶32　　　　In interpreting the Arizona Constitution and determining access to our courts, this Court is free, of course, to adopt or decline to adopt prudential doctrines from the Supreme Court. *See, e.g.*, *Sears v. Hull*, 192 Ariz. 65, 71 ¶¶ 24–25 (1998) ("Because our state constitution does not contain a 'case or controversy' provision analogous to that of the federal constitution, we are not constitutionally constrained to decline jurisdiction based on lack of standing."). In my view, especially where vindication of individual rights is concerned, we should not adopt prudential doctrines that restrict access to the courts or judicial resolution of constitutional issues without careful consideration. The textual requirement of the political question doctrine plainly accords with the Arizona Constitution, which commands that our branches of government "shall be separate and distinct, and no one of such departments shall exercise the powers properly belonging to either of the others." Ariz. Const. art. 3. But the prudential requirement, which avoids constitutional interpretation and enforcement, seems at odds with any constitution that establishes individual rights and limits governmental powers.

¶33　　　　The United States Supreme Court has rarely used the prudential requirement of the political question doctrine as a standalone basis for a non-justiciability ruling. *See* Stillman, *supra* at 1299 (stating that the plurality opinion in *Vieth v. Jubelirer*, 541 U.S. 267 (2004), was "unique" in that "it relied on the lack of judicially discernible and manageable standards as an independently sufficient rationale" under the political question doctrine "without any genuine argument that the issue was

textually committed to a coordinate federal branch"); *see also Nixon*, 506 U.S. at 228–30 (holding that the question was non-justiciable because it was textually delegated to another branch and reasoning that "the use of the word 'try' in the first sentence of the Impeachment Trial Clause lacks sufficient precision to afford any judicially manageable standard of review of the Senate's actions").

¶34          This Court applied the prudential requirement doctrine to hold an issue non-justiciable in *Kromko*, 216 Ariz. at 194 ¶ 21.  In so doing, *Kromko* quoted *Nixon* for the proposition that "the concept of textual commitment to a coordinate political department is not completely separate from the concept of a lack of judicially discoverable and manageable standards," as "the lack of judicially manageable standards may strengthen the conclusion that there is a textually demonstrable commitment to a coordinate branch."  *Kromko*, 216 Ariz. at 193 ¶ 14 (quoting *Nixon*, 506 U.S. at 228–29).  The Court went on to cite both lack of judicially manageable standards and textual commitment to other branches of government to support its decision.  *Id.* at 193 ¶¶ 13–14, 194 ¶ 21.

¶35          Whether the prudential requirement standing alone renders an issue non-justiciable thus remains an open question.  Regardless, in an appropriate case, I would reexamine the prudential requirement of our political question doctrine to determine whether it comports with our constitutional design.  For as the opening words of our Declaration of Rights proclaim: "A frequent recurrence to fundamental principles is essential to the security of individual rights and the perpetuity of free government."  Ariz. Const. art. 2, § 1.